UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| HOMELESS HELPING HOMELESS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| CITY OF TAMPA, FLORIDA | |
| Defendant. | |

## **VERIFIED COMPLAINT**

Plaintiff Homeless Helping Homeless, Inc. ("Plaintiff" or "HHH"), by and through its attorneys, hereby alleges as follows:

## **INTRODUCTION**

1.     Plaintiff HHH is a registered non-profit charity with a compelling mission: organizing dozens of homeless persons in Tampa to help each other in a cooperative and caring fashion, through the provision of shared housing, distribution of food, and the provision of facilities for washing clothes, taking showers, and storing belongings.  In doing so, HHH encourages personal responsibility even as it tends to basic human needs.  Its founder, Adolphus Parker, was honored this April as a finalist for a "HEART" award for his work with HHH by the Housing & Education Alliance of Tampa Bay.  Although HHH utilizes the volunteer labor of its homeless clients in providing many of its services, HHH still has bills to pay and that requires money.  For years, uniformed members of HHH spread word of its mission and sought charitable support from strangers in the locations in Tampa

1

where people are most accessible: in pedestrian-friendly areas such as downtown Tampa and Ybor City, and at traffic lights where cars are stopped.  HHH managed to collect tens of thousands of dollars a year in such a fashion, money desperately needed to support HHH's charitable mission.  Without this major source of funding, HHH faces a significant and growing risk that it will no longer be able to fund its operations and provide needed shelter and services to Tampa's many homeless persons.

2.     HHH is filing this lawsuit because Defendant the City of Tampa (the "City") has—in a discriminatory, content-based manner—progressively eliminated HHH's ability to interact with Tampa residents and visitors to solicit charitable donations.  First, the City has barred HHH volunteers and other charitable solicitors from asking vehicle occupants for donations at stop lights—even as the City has continued to allow commercial newspaper vendors to sell newspapers at such locations.  TAMPA, FLA., CODE ch. 25, art. I, div. 3, § 25-173 ("section 25-173").   Second, the City outlawed speaking with passersby in an expansively designated section of the city—all of downtown and Ybor City—in order to ask for charitable donations.  TAMPA, FLA., CODE ch. 14 art. II, div. 2, § 14-46(b) ("section 14-46(b)," and together with section 25-173, the "Challenged Ordinances").  Under this law, HHH volunteers only can stand mutely holding a sign even while—in areas such as the stretch of Seventh Avenue in Ybor City crowded with bars, cigar shops, tattoo parlors, and a sex shop—raucous conversation goes on all around them.  The City has thus uniquely barred solicitors from engaging in the "close conversation" that the Supreme Court recently confirmed enjoys particular protection under the First Amendment.  *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014).

3.      Both of the Challenged Ordinances are content-based restrictions, because they target one form of speech—certain solicitations—while allowing others to speak a different message (including different solicitations) at the same time and in the same place. Neither can survive the strict scrutiny required of content-based regulations.  The City's interest in traffic safety was the purported impetus for section 25-173, but that interest is belied by the roadside solicitation ban's exemption for newspaper vendors.  Section 14-46(b) also does not further a compelling interest; the promotion of tourism is insufficient justification for abridging the fundamental right of charitable solicitation in a huge swath of the city, especially in a content-based manner.

4.      Even assuming that the Challenged Ordinances are content neutral, they are still unconstitutional.  Neither ordinance is narrowly tailored to accomplish the City's interests.  Taken individually and especially in combination, the Challenged Ordinances also leave inadequate alternative channels for charitable solicitation.

5.      Because the Challenged Ordinances are unconstitutional restrictions on speech, HHH seeks a judgment under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and FLA. STAT. § 86.021, that sections 14-46(b) and 25-173 of the Tampa Code of Ordinances violate HHH's right of freedom of speech under the First and Fourteenth Amendments to the United States Constitution and article one, section four of the Florida Constitution.  Plaintiff also seeks preliminary and permanent injunctive relief in the form of an order enjoining the City from applying or enforcing the Challenged Ordinances.

## THE PARTIES

6.      Plaintiff HHH is a nonprofit corporation founded in 2009.  It is registered as a charitable organization under section 501(c)(3) of the Internal Revenue Code and section 496.405(1) of the Florida Statutes and renews its registration on an annual basis in compliance with State law.  Its chief mission is to aid homeless individuals by providing emergency shelter and to assist homeless men and women in bettering their lives.  HHH is based in Tampa, Florida.

7.      Defendant City of Tampa is a municipal corporation organized under the laws of the State of Florida.  The City is the legal and political governmental entity responsible for the actions of the City of Tampa Police Department and its officials, agents, and employees.

## JURISDICTION AND VENUE

8.      This case arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1988.  The Court also has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.  The Court has jurisdiction over the state law claim presented pursuant to 28 U.S.C. § 1367.

10.      Venue in this district is proper under 28 U.S.C. § 1391(b) because the City is located in this district, and a substantial part of the events or omissions giving rise to the claims occurred within this district.  This case is properly filed in the Tampa Division pursuant to Local Rule 1.02.

## FACTS

11.     Tampa has seen record levels of homelessness in recent years.  As is true in other parts of the country, Tampa's homeless ask for charity on the City's public streets.  So, too, do charitable organizations including HHH.

12.     During this time, the City has enacted a series of increasingly restrictive laws designed to curb charitable solicitation and, ultimately, diminish the visible presence of the homeless in Tampa.

## I.     HOMELESS HELPING HOMELESS

13.     HHH is a Tampa-based organization devoted to providing emergency shelter for individuals in a distressed situation.  Its mission is to break societal stereotypes by giving homeless men and women the opportunity to better their own lives through service.

14.     HHH was founded in 2009 with just a handful of volunteers.  It is now a multi-site operation, providing 89 beds across six different facilities to vulnerable groups of underprivileged Tampa citizens.  Homeless clients serve in key organizational staff positions.

15.     HHH typically houses more than 70 individuals per night, provides free meals to approximately 3,000 individuals per month, distributes hygiene kits, and assists individuals in obtaining social services, educational assistance, and permanent employment.

16.     HHH has no major financial corporate donors or government grants and largely relies on private donations to carry out its operations and fulfill its mission.  To facilitate collection of these private donations, HHH's staff, residents, and volunteers frequently solicit on the organization's behalf from both pedestrians and motorists in Tampa.

HHH historically enjoyed significant success raising money in this manner, and its volunteers encountered very few problems.

## II.    THE CHALLENGED ORDINANCES

17.    The City has not always banned roadside solicitation or limited solicitors in the downtown and Ybor City areas to standing mutely with a sign.

18.    In October 2009, the City enacted Ordinance No. 2009-146, which regulated but still permitted solicitation along Tampa's roads.  Solicitors were required to comply with a number of safety requirements, including the donning of bright vests and only soliciting during daylight.  The law also required that solicited vehicles be lawfully stopped and not be obstructive to the free flow of traffic.  HHH volunteers complied with these requirements and engaged in soliciting for years with considerable success. To Plaintiff's knowledge there were never any incidents or complaints about HHH's volunteers soliciting from vehicle occupants.

19.    The City's willingness to allow charitable solicitation on public roads started to diminish less than a year later, when it began exploring a more restrictive roadside solicitation ordinance.  The City Council considered a ban on the City's busiest roads, prompted by a purported concern about traffic safety.  During the Council's consideration of that ordinance, members of the newspaper industry expressed vehement opposition to any ban on distributing newspapers along Tampa's streets, citing the potential for job losses.  The proposed ordinance ultimately failed.

A. **The City Bans Roadside Solicitation Except By Newspaper Vendors**

20.     The City Council revisited the question of roadside solicitation on September 8, 2011. It did so in the absence of any evidence that roadside solicitation by organizations like HHH acting within the rules had created any safety issues.  It held a workshop to consider three proposals on roadside solicitation.   The first would have banned street solicitation generally, but provided an exemption for newspaper sales.  The second was a six-day ban on solicitation, excluding Sundays.   And the third would have banned street solicitation generally but left an exemption for newspaper sales and leafleting.

21.     Several interest groups expressed their objections to any potential solicitation ban.  Charity groups, for instance, noted that a broad ban would have negative effects on fundraising; they asked the Council to consider a permitting process instead.

22.     Members of the newspaper industry also reiterated their prior objections to a broad solicitation ban.  An attorney for the Tampa Tribune explained that neither charitable solicitors nor newspaper vendors present the risks articulated by a ban's proponents.

23.     At least one Council member, Mary Mulhern, expressed skepticism about whether there was any safety risk from roadside solicitation.  Despite anecdotal evidence about the fear of roadside solicitors, she observed that there was only "one statistic of a death"—a pedestrian who died while intoxicated beyond City limits.

24.     After the workshop, the City Council consolidated its options, moving forward with a legislative package that would impose a six-day ban on roadside solicitation but would grant an exemption for newspaper vendors.

25.     During subsequent consideration of this package, it became clear that the Council sought to protect the newspaper industry.  One council member expressed concern that a severability clause would operate so that, if the newspaper exemption were invalidated, it would endanger the livelihood of one Tampa-based paper—the Florida Sentinel Bulletin— that relied on weekday street sales.  Another council member noted the economic interests at stake, as jobs would be lost without the newspaper exemption.

26.     On October 20, 2011, the Council voted four-to-one to enact a roadside solicitation ban with an exemption for newspaper vendors.

27.     Ordinance No. 2011-127, codified at section 25-173 of the Tampa Code of Ordinances, prohibits individuals from "distributing materials or goods or soliciting business or charitable contributions of any kind" on city roads.  The ban extends to "within four (4) feet of the edge of the road."  *Id.*  The ordinance encompasses "streets, shoulders, roadbeds, medians, and all other ways open to travel by operators of motorized vehicles within the City of Tampa."  Subject to certain restrictions, individuals may solicit on Sundays.  The ban does not apply to certain "expressive activity," defined as speech that does not seek or result in the exchanging of objects from a motorist to a speaker.

28.     Ordinance No. 2011-128, codified at section 6-265 of the Tampa Code of Ordinances, allows "[p]ersons who are authorized and credentialed by a newspaper business . . . [to] sell or offer for sale newspapers while the newspaper salesperson or customer or both are upon the paved portion of a street," provided that certain conditions are met.  The Council passed the ordinance in the interest of furthering the role of newspapers "in . . . local civic discourse."

B.      **The City Bans Solicitors from Downtown Tampa and Ybor City**

29.     Less than two years after the Council passed section 25-173, Tampa Mayor Bob Buckhorn called for action to clamp down on the homeless.  In response, the City Council took up the issue of solicitation once more, starting with a hearing on May 2, 2013. The purpose of the hearing was for the Tampa Police Department to give a staff report "regarding the multiple populations of homeless and vagrancy."

30.     During the meeting, Assistant Chief John Bennett of the Tampa Police Department commented on the "disproportionate challenges in the Ybor and downtown area" caused by homelessness.  After the Assistant Chief's report, the Council began consideration of a solicitation ban for those areas.

31.     Responding to the suggestion of a geographic ban, Councilwoman Mulhern noted that Downtown Tampa and Ybor City are the most pedestrian-friendly communities in Tampa.  She also opined that the designated zones were "a large area to cover."

32.     Other members of the Council expressed support for a solicitation ban and made it obvious that they intended to target the homeless.  One council member, for instance, cited the "newer incarnation of difficulty" that the homeless specifically posed to commercial development and tourism.

33.     One council member asked the City Attorney's office for two draft ordinances.  He first requested a prohibition on solicitation "in front of banks, ATM machines, . . . sidewalk cafes, [and] other specific areas in which people are somehow confined."  The same council member also asked for provisions restricting solicitation in

"downtown and Ybor City . . . the two places where [Tampa has] large numbers of pedestrians on foot and a lot of public activity."

34.     Once the proposed ordinances were drafted and presented to the public, they drew heavy criticism.  The geographic scope of the proposed downtown/Ybor City ban proved particularly controversial.

35.     When asked to defend the geographic scope of the solicitation ban, Rebecca Kert, an assistant city attorney, explained that Downtown Tampa and Ybor City were selected for the draft solicitation ordinance because "there was a recognition that these two areas, maybe not more important than the rest of the city, [] are unique within the city and that they are major tourist venues."  Both areas were "connected by the trolley and . . . very pedestrian oriented," increasing the likelihood of face-to-face encounters.

36.     Pressed further by Councilwoman Mulhern, Ms. Kert explained that there was no "satisfactory answer" to the question of how the geographic boundaries were drawn.  Ms. Kert stated:  "[T]here isn't a magic number out there that five square miles is enough.  And two square miles is enough."  She went on to say the boundaries were not based on "one single factor," or that "there are businesses downtown."

37.     City council members defended the proposed ordinances by citing an interest in "protecting . . . commercial and tourist zones."   A few members of the business community, such as the Ybor City Development Corporation, also voiced their support for the ordinances, citing business interests.   Both proposed ordinances passed with one dissenting vote and went into effect in late July 2013.

38.     Ordinance No. 2013-95, codified at TAMPA, FLA., CODE § 14-46(b), makes it "unlawful in the City . . . for any person to solicit donations or payment when either the solicitor or the person being solicited is located in, on, or at any of the following locations or premises thereof:  (1) Downtown/Ybor Area Prohibited Zone; (2) Bus, trolley stop, or transit stop; (3) Sidewalk café; or (4) Area within fifteen (15) feet (in any direction) of an automatic teller machine or entrance to a financial institution."

39.     Section 14-46 permits "solicitation that only involves holding a sign."  It also allows commercial activities of entities that operate under, *inter alia*, "franchise, concessions, or temporary license agreements or concessions for special events."

40.     "Solicit" is defined as "attempts in person to obtain charitable contributions, or attempts to sell any good or service, for the benefit of the solicitor or on behalf of an individual or organization."

41.     The "Downtown/Ybor Area Prohibited Zone" ("Prohibited Zone") covers "the land area bounded on the north by West Palm Avenue (to the northern edge of pavement), bounded on the west by North Boulevard (to the western edge of pavement) until North Boulevard crosses the Hillsborough River, then by the Hillsborough River (to the water's edge), bounded on the south by Garrison Channel (to the water's edge), and bounded by the east by Ybor Channel (to the water's edge) as far north as E. Harbor Street (the northern edge of pavement) then west until the eastern edge of pavement of N. 14th Street, then north until the southern edge of pavement of Adamo Dr., then east until the eastern edge of 26th Street bounded on the east by 26th Street (to the eastern edge of pavement)."



C.      **The Effect of the Challenged Ordinances on Plaintiff**

42.     Prior to the implementation of section 25-173, HHH's staff, residents, and volunteers frequently and safely solicited on behalf of the organization from drivers on many of the City's roads.  On average, HHH collected $3,200 per month from these roadside solicitations.  HHH's solicitors complied with all applicable safety requirements, including the wearing of high-visibility vests. They also wore identification indicating their affiliation with HHH.

43.     HHH stopped its solicitation activities alongside City roads because it understood they were barred by section 25-173.  But for this ordinance, HHH volunteers would continue to solicit contribution from vehicle occupants in Tampa.



44.    When the City implemented section 25-173, HHH shifted its in-person collection efforts to Downtown Tampa and Ybor City. HHH volunteers chose areas where there was ample foot-traffic and they could reach a broad audience, but where there was wide sidewalk space to solicit safely and without causing disruptions.  In 2013, HHH collected over $26,000 in charitable contributions from pedestrians in these areas.

45.    As they did when soliciting on roadways, HHH volunteers soliciting downtown and in Ybor City wore identification with their organizational affiliation.  In the course of soliciting, representatives distributed written materials regarding HHH, discussed the organization's mission of providing homeless individuals with emergency and shelter services while directly involving the homeless in HHH's operation, and invited passersby to place donations into a sealed container.



46. As far as HHH is aware, Tampa Police have never received any serious complaints about the conduct of HHH's volunteers, and its volunteers were not cited by the police for any inappropriate behavior while soliciting.

47. With the implementation of section 14-46(b), HHH now has been shut out from soliciting in the City's major pedestrian areas too. Because of its inability to solicit in the Prohibited Zone, HHH has lost tens of thousands of dollars since the ordinance went into effect.

48. The loss in donations received by street solicitors has hampered HHH's ability to provide essential services to the Tampa homeless population. HHH has been forced to abandon plans to provide additional services to Tampa's many homeless individuals and to cut back on some existing services.

49.     HHH would like its members, staff, and residents to solicit on its behalf in the Prohibited Zone, but has been warned by police that doing so will result in criminal sanctions.   As a practical matter, HHH knows that it is impossible for its volunteers to effectively solicit charitable contributions while standing mutely with a sign, nor is it human nature for people to avoid talking with would-be or actual donors.   As a result, HHH has stopped soliciting in downtown Tampa and Ybor City.   But for the ordinance, HHH volunteers would continue to solicit in these locations.

50.     HHH has worked hard to find alternative sources of funding to the money it raised while soliciting for contributions, but it has faced repeated obstacles and it has not been able to replace the consistent source of revenue it raised through soliciting for contributions before the ordinances went into effect.   As long as these laws remain in place, HHH faces a serious risk that it will no longer be able to continue its operations and provide shelter and services to homeless persons in Tampa.

## III.    THE CHALLENGED ORDINANCES ARE UNCONSTITUTIONAL RESTRICTIONS ON SPEECH

51.     "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).   Government restrictions on speech therefore fall into one of two categories.   They are content based if they "impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).   Put differently, if "enforcement authorities" are required to "'examine the content of the message that is conveyed to determine whether' a violation has occurred," a law restricting speech is content-based. *McCullen*, 134 S. Ct. at 2531 (quoting *FCC v.*

*League of Women Voters of Cal.,* 468 U.S. 364, 383 (1984)).  On the other hand, if a regulation "places no restrictions" on "any subject matter that may be discussed," the regulation is content neutral.  *Hill v. Colorado*, 530 U.S. 703, 723 (2000).

52.     Both of the Challenged Ordinances are content based, and neither can survive the First Amendment scrutiny applied to content-based laws.  Indeed, even if found to be content-neutral laws, the Challenged Ordinances still fail constitutional scrutiny.

A.     **Section 14-46(b) Is Unconstitutional**

53.     Section 14-46(b) prohibits "charitable contributions, or attempts to sell any good or service, for the benefit of the solicitor or on behalf of an individual or organization" in the downtown and Ybor City districts.  But it allows many other forms of speech uttered in the same time, place, and manner, such as licensed commercial vending and political speech. Because Tampa's law enforcement officials must "examine the content of the message that is conveyed" to discern whether the speaker has violated the ban, it is content based.  *See McCullen*, 134 S. Ct. at 2531.

54.     Content-based regulations, like section 14-46(b), are subject to "the most exacting scrutiny."  *Turner*, 512 U.S. at 642.  They are constitutional only if they are the least restrictive means of advancing a compelling governmental interest.

55.     The City had no compelling interest in implementing section 14-46(b).  The Council asserted that the ban would help promote tourism and commercial interests in the downtown and Ybor City districts.  But the promotion of local commerce and tourism are not sufficiently compelling so as to survive strict-scrutiny review.  *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1268 (11th Cir. 2005) (tourism); *ACLU v. City of Las Vegas*,

466 F.3d 784, 797 n.4 (9th Cir. 2006) (commercial interests).  Section 14-46(b) also does not further a compelling interest in safety because it bans peaceful solicitation.  The City already had a ban on "aggressive" solicitation in place.

56.    Even if section 14-46(b) were a content-neutral restriction on the time, place, or manner of speech, it still would fail review under the First Amendment because it is not narrowly tailored.  Content-neutral regulations of speech in traditional public fora, like the streets of downtown Tampa and Ybor City, must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests."  *McCullen*, 134 S. Ct. at 2535 (citation and internal quotation marks omitted).

57.    Section 14-46(b) does not satisfy the narrow-tailoring requirement for at least three reasons.  *First*, allowing persons on public sidewalks and in other public places who already may be holding signs requesting charitable contributions to also interact vocally with passersby in a polite and respectful fashion does not pose a threat to tourism or business. For example, in areas such as Ybor City, the ban applies to a commercial strip on Seventh Avenue that is crowded with bars, clubs, tattoo parlors, cigar shops, and an adult novelty store, with loud music and conversation spilling into the street throughout the night.  The City has no legitimate interest in requiring solicitors—and only solicitors—to stand mute in such an atmosphere, forbidden from speaking to passersby.

58.    *Second,* the ordinance is overinclusive as a matter of geography.   The Prohibited Zone contains many pockets of land not frequented by tourists or tied to economic activity, including the Tampa Police Department headquarters, the Hillsborough County Courthouse, and the Office of the Mayor of Tampa.   In Ybor City, the ban extends past the main tourist and commercial attractions into vast areas full of auto body shops, warehouses, and residential apartment complexes.

59.    *Third*, options less restrictive of protected speech, including heightened enforcement of laws against aggressive solicitation, disorderly conduct, and the like, were available to, yet untried by, the City.   Narrow tailoring is not satisfied simply because an approach that burdens a greater amount of speech is easier to implement.  *See McCullen*, 134 S. Ct. at 2540.

60.    Section 14-46(b) also leaves inadequate alternative channels of communication.   Charitable solicitors like HHH are left with two options.   They may go to parts of Tampa less frequented by pedestrians and which therefore are less effective for communicating with pedestrians.   Or they may engage in non-vocal communication, which deprives them of an opportunity to develop a rapport with the general public—rapport that is crucial for obtaining donations.   Section 14-46(b) has thus made it far more difficult to solicit contribution while out in Tampa's public spaces.

61.    By either measure of scrutiny—strict or intermediate—section 14-46(b) violates the First Amendment.

B.      **Section 25-173 Is Unconstitutional**

62.     Section 25-173's ban on the solicitation of "business or charitable contributions of any kind from the occupant of any motorized vehicle located on public roads in the City of Tampa" also is a content-based restriction.  By crafting a special exemption in section 6-265 that allows the sale of newspapers on those roads, the City has passed judgment that speech seeking charity is less desirable than the speech of newspaper vendors. The City's roadside solicitation ban is therefore content based.

63.     Section 25-173 cannot survive strict scrutiny because the City has no compelling interest in the ordinance.  Although the City claims that it has an interest in promoting traffic safety, that interest is severely undercut by the ordinance's under-inclusiveness—the glaring and considerable exemption for newspaper vendors.  There is no public-safety reason why charitable solicitors should not be allowed to solicit from drivers under the same conditions applicable to newspaper vendors.  The under-inclusiveness of the ban completely undermines any argument that the interest is compelling.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).  Lacking a compelling interest, section 25-173 cannot survive strict scrutiny.

64.     Nor is the law narrowly tailored to either a compelling or significant government interest.  The existence of an exemption for newspaper vendors—one with conditions related to public safety—demonstrates that public solicitation on the City's roads can be conducted safely, defeating any argument that section 25-173's prohibition on charitable solicitations is narrowly tailored.  So long as a newspaper vendor wears a high-visibility vest, does not solicit on certain busy intersections, does not impede the flow of

traffic, does not harass a motorist or vehicle occupant, and stands on a median or two feet outside of the road during the flow of traffic, that vendor is presumed to be capable of safe roadside solicitation.  If the City finds these restrictions effective for newspaper vendors, they surely would be effective for charitable solicitors too.

65.     Other less-restrictive measures, such as roadside bans that allow solicitation from medians or sidewalks or that were limited to certain intersections, were also available to the City.  But despite the availability of less-restrictive options, the City took the path of least resistance, one that imposes an undue burden on the speech of charitable solicitors.

66.     Section 25-173 also leaves no adequate alternative channels of solicitation. On its own, the ordinance entirely forecloses access to a particular audience—Tampa's drivers.  Operating in conjunction with section 14-46(b), section 25-173 also makes it difficult for organizations like HHH to engage in vocal solicitation in any place where such solicitation might be effective and might find an audience.

## CLAIMS FOR RELIEF

### Count I
### Violation of 42 U.S.C. § 1983

67.     Plaintiff hereby re-alleges Paragraphs 1 through 66 as though fully set forth herein.

68.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law,

suit in equity, or other proper proceeding for redress."

69.     The First Amendment to the United States Constitution, as applicable to the States through the Fourteenth Amendment, prohibits the making of any law that "abridg[es] the freedom of speech."

70.     As described above, the Challenged Ordinances, on their face and as applied to Plaintiff, unconstitutionally infringe or imminently threaten to infringe on Plaintiff's rights under the First and Fourteenth Amendments, including its right to freedom of speech and expression.

71.     HHH's speech has been chilled by the enactment of these ordinances that penalize its expression. But for the ordinances, HHH, through its representatives, would continue to engage in the solicitation that is now restricted. HHH's loss of its First Amendment rights and the chilling of its expression is an irreparable injury that cannot be cured by the award of money damages if HHH ultimately prevails in this litigation.

72.     Because the City has acted and threatened to act under the color of state law to deprive Plaintiff of rights guaranteed by the Constitution and laws of the United States, Plaintiff may sue and seek relief pursuant to 42 U.S.C. § 1983.

73.     As a result, Plaintiff is entitled to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

## Count II
## Declaratory Judgment Under 28 U.S.C. § 2201(a) and Florida Statutes § 86.021

74.     Plaintiff hereby re-alleges Paragraphs 1 through 73 as though fully set forth herein.

75.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought."

76.     Section 86.021 of the Florida Statutes states "[a]ny person claiming to be interested or who may be in doubt about his or her rights . . . whose rights, status, or other equitable or legal relations are affected by . . . municipal ordinance . . . may have determined any question of construction or validity arising under such . . . municipal ordinance . . . or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder."

77.     Article one, section four of the Florida Constitution states "[n]o law shall be passed to restrain or abridge the liberty of speech or of the press."

78.     As described above, Plaintiff alleges that the Challenged Ordinances, on their face and as applied to Plaintiff, violate the First and Fourteenth Amendments to the United States Constitution.

79.     The Challenged Ordinances also abridge the freedom of speech as guaranteed by the Florida Constitution.

80.     Upon information and belief, the City will enforce the Challenged Ordinances.

81.     There is an actual controversy between the parties as to whether the Challenged Ordinances are unconstitutional under both the federal and state constitutions.

82.     Plaintiff seek a declaration that the Challenged Ordinances are unconstitutional and violate Plaintiff's right to freedom of speech as guaranteed by the First

and Fourteenth Amendments of the United States Constitution, in addition to article one, section four of the Florida Constitution.

*       *       *

WHEREFORE, Plaintiff respectfully request the following relief:

a)      A preliminary and permanent injunction prohibiting the City from enforcing the Challenged Ordinances;

b)      A declaratory judgment holding that the Challenged Ordinances violate the United States Constitution, including the First and Fourteenth Amendments to the Constitution, and the Florida Constitution, including article one, section four;

c)      An award to Plaintiff of costs and attorney's fees; and

d)      Any such other and further relief that this Court deems just and proper.

Dated:  May 20, 2015

Respectfully submitted,

HOMELESS HELPING HOMELESS, INC.

By its attorneys,

/s/ David M. Snyder
Kevin P. Martin (*pro hac vice pending*)
Joseph P. Rockers (*pro hac vice pending*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Phone:  (617) 570-1000
Fax:  (617) 523-1231
KMartin@goodwinprocter.com
JRockers@goodwinprocter.com

Frederick C. Schafrick (*pro hac vice pending*)
Brian T. Burgess (*pro hac vice pending*)
Andrew Kim (*pro hac vice pending*)
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, D.C. 20001
Phone:  (202) 346-4000
Fax:  (202) 346-4444
FSchafrick@goodwinprocter.com
BBurgess@goodwinprocter.com
AndrewKim@goodwinprocter.com

David M. Snyder
Florida Bar No. 366528
DAVID M. SNYDER, P.A.
4230 S. MacDill Ave.
Suite 229
Tampa, FL 33611
Phone:  (813) 258-4501
dmsnyder@dms-law.com

*Counsel for Homeless Helping Homeless, Inc.*

## VERIFICATION

I verify under penalty of perjury that the foregoing Verified Complaint, insofar as it relates to Homeless Helping Homeless, Inc., is true and correct to the best of my personal knowledge and a review of available records.

Executed on this 20th day of May, 2015.

Adolphus Parker, President
Homeless Helping Homeless, Inc.