UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| HOMELESS HELPING HOMELESS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| CITY OF TAMPA, FLORIDA | |
| Defendant. | |

## **MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 65(a) and in compliance with Local Rules 4.06 and 4.05, Homeless Helping Homeless, Inc. ("HHH") moves for an order enjoining the City of Tampa, Florida (the "City"), its officers, agents, employees, attorneys, and all persons who are in active concert with them from enforcing TAMPA, FLA., CODE ch. 14 art. II, div. 2, § 14-46(b), and from enforcing TAMPA, FLA., CODE ch. 25, art. I, div. 3, § 25-173, insofar as the latter prohibits individuals from being upon or going upon any road, or being within four feet of the edge of the road, in order to solicit charitable contributions from the occupant of a vehicle under circumstances where newspaper sales conducted in the same time, place, and manner would be permitted, *see* TAMPA, FLA., CODE ch. 6, art. III, div. 12, § 6-265.

For the reasons set forth in the following Memorandum of Law, the Court should grant HHH the requested relief.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests oral argument with regard to this motion and submits that one hour (30 minutes per side) should be sufficient time for argument.

## MEMORANDUM OF LAW

This action concerns the City's attempt to move its homeless citizens out of sight through a targeted assault on their First Amendment rights. It is firmly established that the "solicitation of charitable contributions is protected speech" under the First Amendment to the United States Constitution. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 789 (1988). Disregarding that constitutional guarantee, Tampa has regulated solicitation effectively out of existence throughout wide swaths of the City, curtailing an entire category of expression within places—streets, sidewalks, traffic medians, and parks—where the government's ability to restrict speech is "very limited." *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (internal quotation marks omitted).

Tampa's solicitation restrictions have had a dramatic and negative effect on Plaintiff HHH's ability to raise the funds it needs to provide emergency shelter and aid to Tampa's homeless. Prior to 2011, HHH had success raising money from the public by having volunteers solicit contributions from vehicles while standing alongside the City's streets. HHH volunteers solicited in this way without incident while wearing brightly colored safety vests. The City, however, enacted an ordinance (section 25-173) that bans the solicitation of contributions from vehicle occupants throughout Tampa (with a partial reprieve from the ban on Sundays). While the City claims the ordinance was a safety measure, the pretextual nature of that justification is laid bare by the City's adoption of an exemption for roadside newspaper sales.

In response to the roadside ban, HHH shifted to soliciting donations from pedestrians. HHH naturally focused on the areas of Tampa that are most pedestrian-friendly: downtown and the Ybor City district. But less than two years after it had enacted the roadside solicitation ban, the City took away this speech opportunity as well. Amending a law that had prohibited only *aggressive* solicitation, the Tampa City Council passed a new provision (section 14-46(b)) prohibiting *all* vocal solicitation for money in downtown Tampa and Ybor City.

Together, these two ordinances have imperiled HHH's very survival. HHH has struggled to find alternative sources of revenue, and its ongoing inability to solicit donations in so much of Tampa puts at risk its ability to continue to provide shelter and service to Tampa's homeless population. HHH challenges both ordinances here and it is entitled to a preliminary injunction against their enforcement. HHH satisfies all four factors for preliminary injunctive relief.

*First*, HHH is likely to succeed in its claims that the ordinances violate the First Amendment, both on their face and as applied to HHH. Both ordinances are content based and will not survive strict scrutiny. Section 14-46(b) restricts speech on a single subject—solicitations for money—while leaving other speech and even other forms of solicitation unregulated. An individual in downtown Tampa can ask a pedestrian whether she has accepted Jesus Christ as her savior or invite her to sign a petition to legalize marijuana. But if he asks her to donate to charity, he is a criminal. Likewise section 25-173 bans roadside solicitation for charity while exempting newspaper sales, even if the charitable solicitor and newspaper vendor are identically situated in all other respects.

Content-based laws are presumptively unconstitutional and the City will not be able to defeat that presumption here. Even if the Court were to conclude that the ordinances are

content neutral, HHH is still likely to prevail because the laws are not narrowly tailored. Tampa's asserted interests in this case are hardly unique; all cities seek to protect the safety of their residents and visitors, and many other cities have downtown business districts and historic districts. Yet most cities do not shut off vast geographic areas to effective solicitation and instead pursue their interests through more targeted measures. Tampa's more sweeping approach cannot survive First Amendment scrutiny.

*Second*, Plaintiffs will suffer irreparable harm absent injunctive relief. "'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). *Third*, the balance of harms favors an injunction. Any interest that the City has in enforcing the ordinances is far outweighed by the burden on Plaintiff's First Amendment rights and the threat to its survival due to lost solicitation opportunities. *Fourth*, the public interest calls for an injunction, because the public has no interest in enforcing unconstitutional laws.

## BACKGROUND

The full set of facts relevant to this motion are set forth in greater detail in Plaintiffs' Verified Complaint and the declaration accompanying this motion. The following is a summary of the most relevant facts.

## I.    Homeless Helping Homeless

HHH is a 501(c)(3) tax-exempt nonprofit organization that is registered as a charity with the State of Florida and renews its registration on an annual basis in compliance with state law. Compl. ¶ 6. HHH provides emergency shelter and other vital services to Tampa's many homeless and impoverished residents. *Id*. Since 2009, HHH has grown

from a handful of volunteers to a multi-site operation, providing 89 beds at six different facilities to vulnerable groups of underprivileged Tampa residents—with many key staff positions being filled by homeless clients. Compl. ¶ 14. The organization's mission is to provide emergency shelter to anyone in a distressed situation, and its vision is to shatter stereotypes by providing that service through the efforts of homeless men and women themselves. Compl. ¶ 13.

HHH has no major financial corporate donors or government grants. Compl. ¶ 16. As a result, the organization has relied on modest private donations from individuals to carry out its important mission. *Id*. In particular, HHH historically funded many of its activities by soliciting contributions from both pedestrians and motorists in Tampa. *Id*.

HHH enjoyed significant success raising money in this manner and its volunteers encountered very few problems. Compl. ¶ 16. But HHH's access to these critical sources of revenue and its ability to spread its message have been dramatically curtailed by a series of ordinances passed by the Tampa City Council to restrict solicitation. These restrictions have made it illegal for HHH to engage in constitutionally protected speech throughout large sections of the City—even as other speakers can engage in the same conduct in the same places if they avoid asking for money. The effect on HHH has been devastating. Even as HHH tries desperately to raise money in other ways, its ability to continue to fund its operations and assist the homeless has been placed in doubt.

## II. The Challenged Anti-Solicitation Ordinances

### A. Section 25-173: The Roadside Solicitation Ban

The sidewalks and traffic medians adjoining Tampa's roads have historically been prime locations for charitable solicitation. Prior to 2011, roadside solicitors were required to don brightly colored safety apparel and solicit only during daytime hours. Compl. ¶ 18.

HHH volunteers regularly engaged in roadside solicitation in compliance with these laws without incident and with considerable success. *Id.*

Beginning in 2011, the City Council took up a measure to restrict roadside solicitation. It did so without any evidence that roadside solicitation by organizations like HHH acting within the rules had created any safety issues. Compl. ¶ 20. The Council did face formidable opposition from members of the newspaper industry, which warned them a total ban on roadside solicitation would hamper newspaper sales and result in layoffs. Compl. ¶ 19. The Council ultimately enacted two ordinances simultaneously, combining a broad ban on roadside solicitation with an exemption only for newspaper vendors. Compl. ¶¶ 24-28.

Section 25-173 prohibits individuals from "soliciting . . . charitable contributions of any kind" while upon city roads or "within four . . . feet of the edge of the road." § 25-17(e)(1). The solicitation ban extends to "streets, shoulders, roadbeds, medians, and all other ways open to travel by operators of motorized vehicles within the City of Tampa." § 25-173(c). The law allows solicitation on Sundays, subject to a number of conditions, including the wearing of high-visibility road apparel and an all-hours prohibition for 10 specific intersections. § 25-173(f). It also permits certain expressive activities like sign-holding, picketing, and the distribution of literature, *provided* the speech "does not seek or result in an exchange of objects between a motorist and a person in the road or within four . . . feet of the road." § 25-173(e)(1).

Section 6-265, in turn, creates a special exemption from section 25-173 for newspaper vendors. So long as a newspaper vendor meets certain minimum safety requirements, such as wearing a high-visibility vest, not obstructing oncoming traffic, and staying off the ten busiest intersections in Tampa, she may solicit on Tampa's roads on a

newspaper's behalf. *See* TAMPA, FLA., CODE § 25-173(b). Even if a non-newspaper solicitor follows all the same safety precautions as a newspaper vendor, she cannot take advantage of this exemption.

**B.**     **Section 14-46(b): The Downtown and Ybor City Solicitation Ban**

    1.    <u>HHH's Efforts to Solicit Contributions From Pedestrians in Downtown Tampa and the Ybor City District</u>

After section 25-173 forced HHH to abandon roadside solicitation, the organization shifted its fundraising efforts to soliciting pedestrians in Tampa's downtown and Ybor City districts. Compl. ¶ 44. HHH volunteers chose areas where there was ample foot-traffic to ensure a broad audience, and also where there was wide sidewalk space to solicit safely without causing disruptions. *Id.* As they had when soliciting from medians, HHH volunteers wore identification that displayed their affiliation with HHH. Compl. ¶ 45. In the course of soliciting, volunteers distributed written materials regarding HHH, discussed HHH's mission, and invited passersby to place donations into a sealed container. *Id.*

While the roadside-solicitation ban inhibited HHH's fundraising potential, HHH was able to continue collecting funds through these in-person solicitation efforts. In 2013, HHH collected over $26,000 in donations through in-person solicitations in downtown Tampa and Ybor City. Compl. ¶ 44. These solicitation efforts also provided valuable opportunities for HHH volunteers to spread awareness about HHH and its mission of providing the homeless with both emergency shelter and services and opportunities for service. Compl. ¶ 45. As far as HHH is aware, Tampa Police have never received any serious complaints about the conduct of HHH's volunteers, and its volunteers were not cited by the police for any inappropriate conduct while soliciting. Compl. ¶ 46.

2.      Tampa Restricts Solicitation Downtown and in Ybor City

On July 18, 2013, the City enacted a package of laws targeting its perceived problems with the homeless.  In the ordinance that HHH challenges here, section 14-46(b), the City imposed a prohibition on the solicitation of charitable contributions in significant portions of the city, including the entire downtown and Ybor City.

Section 14-46 defines solicitation as any "attempt[] in person to obtain charitable contributions, or attempt[] to sell any good or service, for the benefit of the solicitor or on behalf of an individual or organization."  § 14-46(c)(1).  The definition extends only to solicitations for money and thus excludes other forms of solicitation, such as asking for signatures on a petition.  Section 14-46 contains two distinct bans.

First, subsection 14-46(a) incorporates a pre-existing ban on "aggressive" solicitation that was in place long before the enacted ordinance.  That subsection bans soliciting donations or payment by making "an express or implied threat"; by "[e]ndeavoring to maintain contact with a solicited person" and "continuing to verbally demand, ask or beg for, or to solicit donations or payment" after that person declines an initial request; or by attempting "to impede the passage or free movement of [a] solicited person."  § 14-46(a).  HHH's volunteers have never been found in violation of these prohibitions, and HHH does not challenge the aggressive panhandling ban in this case.

Second, subsection 14-46(b) added a new speech restriction, making it unlawful for "any person to solicit donations or payment when either the solicitor or the person being solicited is located in, on, or at" certain prohibited zones throughout the city.  The nonsolicitation zones include the entire downtown area and the Ybor City district, § 14-46(b)(1), along with any "[b]us, trolley stop, or transit stop," "[s]idewalk café," or area within 15 feet of an ATM or "entrance to a financial institution."  § 14-46(b)(2)-(4).  The

law provides for two limited exceptions, exempting "solicitation that *only* involves holding a sign," § 14-46(b) (emphasis added), as well as the activities of certain commercial entities that, *inter alia*, operate under "franchise, concessions, or temporary license agreements or concessions for special events," § 14-46(d). Violation of the ban is punishable by a fine of up to $500 and/or 60 days in jail. § 14-46(e) (citing TAMPA, FLA., CODE OF ORDINANCES ch. 1, § 1-6).

According to the City, the ordinance was designed to "promote public safety, and protect its citizens and visitors and promote the Ybor City and general downtown area as tourist destinations and economic engines for the City," as well as to "protect its citizens and visitors in areas where they may be or perceive themselves to be vulnerable and/or unable to leave." Declaration of Andrew Kim ("Kim Decl."), Ex. 3, at 13. The ordinance's preamble did not include any findings that solicitation in the prohibited areas had interfered with these interests, nor did it explain why the preexisting ban on aggressive solicitation was insufficient.

### 3.  Section 14-46(b)'s Impact on HHH

After Section 14-46(b) went into effect, a member of the City of Tampa Police Department informed HHH that the ordinance prohibited solicitation throughout the downtown area and Ybor district of Tampa and that Tampa police would enforce it by arresting HHH volunteers found soliciting there. HHH heeded the officer's warning and its volunteers have not solicited within the prohibited zones since its ordinance went into effect. As a result, HHH has lost countless opportunities for its volunteers to advocate for the organization and to seek much-needed donations.

The impact on HHH has been significant. HHH estimates that it has lost tens of thousands of dollars in contributions since the ordinance went to effect. Compl. ¶ 47. This

funding decline has forced HHH to abandon plans to provide additional services to Tampa's

many homeless individuals and to cut back on some existing services.  Compl. ¶ 48.

## ARGUMENT

HHH is entitled to a preliminary injunction enjoining the enforcement of section

14-46(b) (the downtown/Ybor City solicitation ban) and section 25-173 (the roadside

solicitation ban).  A district court may issue preliminary injunctive relief when the plaintiff

demonstrates that:  (1) there is "a substantial likelihood that [it] will succeed later on the

merits"; (2) it "will suffer an irreparable injury absent preliminary relief"; (3) the plaintiff's

injury likely "outweighs any harm that its opponent will suffer as a result of an injunction";

and (4) preliminary relief would not "disserve the public interest."  *Scott v. Roberts*, 612

F.3d 1279, 1290 (11th Cir. 2010).  HHH's motion satisfies each factor.

## I.      HHH Is Likely to Succeed on the Merits

HHH is likely to succeed in showing that Tampa's anti-solicitation ordinances are

unconstitutional speech restrictions, both on their face and as applied to HHH.[1]  Both

ordinances limit speech within public forums on the basis of content, criminalizing requests

for charitable contributions while leaving other speech in the same time and place (and

conducted in the same manner) unrestricted.  Such "content-based regulations are

presumptively invalid," *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817

(2000) (*quoting R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992)), and Tampa has no reasonable

prospect of defeating that presumption here.  Even under the test for content-neutral laws,

neither ordinance would be likely to survive as a time, place, and manner restriction.  The

ordinances are wholly disproportionate to the City's asserted interests in tourism and public

---

[1] The protection afforded to speech under article 1, section 4 of the Florida Constitution "is the same" as the protection provided by the First Amendment  *Dep't of Educ. v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982). Accordingly, HHH's First Amendment arguments apply in full to its state-law claims.

safety and fail to leave HHH (and other similarly situated speakers) with realistically adequate alternatives for expression.

## A.    <u>Standard of Review</u>

The speech restricted by sections 14-46(b) and 25-173 occurs within traditional public fora—the City's streets, sidewalks, traffic circles, and parks. Eleventh Circuit precedent "conclusively establishes that . . . sidewalk spaces [are] public forum[s]." *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999). "[P]ublic streets and parks" are quintessential public forums, which, "have been immemorially held in trust for the use of the public" for assembly and expression. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citation omitted)). Federal courts have repeatedly held that traffic islands adjacent to roadways are traditional public forums. *See, e.g.*, *Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015); *Satawa v. Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 520-22 (6th Cir. 2012); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011) (en banc).

The government's ability to restrict speech in a traditional public forum is "very limited." *McCullen*, 134 S. Ct at 2529 (internal quotation marks a omitted). Content-based regulations of speech applicable there are presumptively unconstitutional and subject to strict scrutiny; to survive, the government bears the burden of proving that the law is the "least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005). Even for content-neutral laws, heightened scrutiny applies, and the government bears the burden of proving (1) that the law is "narrowly tailored" to a "significant governmental interest," and (2) "leave[s] open ample alternative channels" for the plaintiff's expression. *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1330 (M.D. Fla. 2011).

**B.      HHH Is Likely To Demonstrate That Section 14-46(b) Is Unconstitutional on its Face and As Applied to HHH**

      1.      Section 14-46(b) Is an Invalid Content-Based Speech Restriction

          a.      Section 14-46(b) Is Content Based

A law is content based if "it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred," *McCullen*, 134 S. Ct. at 2531 (citation omitted). Put another way, if a law's application to certain speakers "depends on what they say," then it is content based. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010). By contrast, a law is content neutral if it "'places no restrictions on . . . either a particular viewpoint or any subject matter that may be discussed." *Solantic*, 410 F.3d at 1259 (citation omitted).

Section 14-46(b) is content based because it restricts speech pertaining to one subject—solicitation—while leaving all other speech unrestricted even if it occurs in the same time, place, and manner. Someone may approach tourists in downtown Tampa or Ybor City to proselytize for a religious group or to advocate for raising the minimum wage. But if the same person vocally asks the same tourists to donate to charity, she will have committed a crime and could be jailed. By singling out solicitation in this way, the law regulates on the basis of content. *See, e.g.*, *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665 (2015) (holding that Florida's ban on personal solicitation for campaign contributions by candidates for judicial office is a content-based speech regulation subject to strict scrutiny); *Planet Aid v. City of St. Johns, Mich.*, 782 F.3d 318, 329–30 (6th Cir. 2015) (law banning unattended outdoor charitable donation bins, but not other bins, is content based); *ACLU v. City of Las Vegas*, 466 F.3d 784, 794 (9th Cir. 2006) (anti-solicitation ordinance applicable to downtown Las Vegas is content based because "[h]andbills with certain content pass muster [and] those requesting financial or other assistance do not"); *Loper v.*

*N.Y. City Police Dep't*, 999 F.2d 699, 705 (2d Cir. 1993) (loitering ordinance was "not content neutral because it prohibit[ed] all speech related to begging").[2]

Section 14-46(b) also distinguishes between different *types* of solicitation. Vocal requests for "charitable contributions" are illegal, § 14-46(c)(1); vocal requests to sign a petition are not. As other courts have recognized, laws that distinguish between types of solicitation and only regulate requests for money are content based. *See, e.g., Clatterbuck v. City of Charlottesville*, No. 3-11-cv-00043, 2015 WL 727944, at *3-4 (W.D. Va. Feb. 19, 2015) (law banning solicitations for immediate donations is content based); *ACLU of Idaho, Inc. v. City of Boise*, 998 F. Supp. 2d 908, 916 (D. Idaho 2014) (concluding that an ordinance similar to Tampa's is likely content based because it "suppress[ed] particular speech related to seeking charitable donations and treats this speech content different than other solicitation speech").

In this Circuit, that is the end of the matter: because section 14-46(b) subjects speech to regulation based on its subject matter, the law is content based *regardless* of the City's rationale. *See Solantic*, 410 F.3d at 1259-60 & n.8.[3] But in any event, the City's evident motive for enacting section 14-46(b) confirms it is content based. Laws are content based "if they are] concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or '[l]isteners' reactions to speech.'" *McCullen*, 134 S. Ct. at 2546 (*quoting*

---

[2] In *Smith v. City of Fort Lauderdale,* the Eleventh Circuit upheld an ordinance banning soliciting, panhandling, and begging on a five-mile strip of beach as a valid time, place, or manner restriction. 177 F.3d at 956-57. But the plaintiffs in that case did not argue that the ordinance was content based, and the Court therefore had no occasion to consider the question. *Id.* at 956. As a result, *Smith* is not a precedent on the question whether solicitation restrictions are content neutral. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) (explaining that an earlier decision did not serve as a precedent on an issue that was "apparently not argued to the . . . panel").

[3] The City may cite *Norton v. City of Springfield, Ill.*, 768 F. 3d 713, 717 (7th Cir. 2014), *petition for en banc review filed*, No. 13-3581 (Oct. 9, 2014) and *Thayer v. City of Worcester*, 755 F.3d 60, 71 (1st Cir. 2014), *petition for cert. filed*, No. 14-428 (U.S. Oct. 14, 2014), but both decisions are pending further review and are in any event inconsistent with Eleventh Circuit precedent on the test for content neutrality.

*Boos v. Barry*, 485 U.S. 312, 321 (1988)). "[O]ffense or discomfort" at hearing certain messages in particular locations "would not give the [government] a content-neutral justification to restrict the speech." *Id.* at 2532; *see also Clatterbuck*, 2015 WL 727944, at *12 (an "imagined listener's reaction" to "beggars" was not a content-neutral rationale for a law prohibiting the solicitation of immediate donations in a prohibited zone near the city's downtown mall).

Here, the City's justifications for section 14-46(b) turn on the "listeners' reaction to speech," and in particular on the City's concern that hearing requests for money (even those made peacefully and respectfully) will make tourists and people in town for business uncomfortable. That is the only inference to draw from the City's determination that restricting solicitation for money—but not other speech—was necessary to "promote the Ybor City and general downtown area as tourist destinations and economic engines." Kim Decl., Ex. 3, at 13.

Moreover, the obviously underinclusive way that section 14-46(b) furthers the City's purported interests raises a "red flag" about the City's motives. *Williams-Yulee*, 135 S.Ct. at 1668. Consider, for example, the City's purported interest in protecting individuals from unwanted speech where they "may be or perceive themselves to be vulnerable and/or unable to leave." Kim Decl., Ex. 3, at 13. Section 14-46 does not prevent political activists from cornering people and demanding that they sign a petition. It does not even prevent those activists from hounding someone who refuses to sign until she relents. Yet peacefully asking someone a single time to contribute to charity at the *exact same location* is now a criminal act. When a law is "wildly underinclusive" in this way, it "rais[es] serious doubts about whether [the City] is in fact pursuing the interest it invokes, rather than disfavoring

a particular speaker or viewpoint." *Brown v. Entm't Merchs. Ass'n v. Brown*, 131 S. Ct. 2729, 2740 (2011).

b.     <u>Section 14-46(b) Cannot Survive Strict Scrutiny</u>

"Few laws survive [strict] scrutiny, and this Ordinance is no exception." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1255 (11th Cir. 2004). The ordinance's preamble suggest that the City recognizes as much. The City did not identify any compelling interest that section 14-46(b) serves, nor did it claim that the ordinance is the least restrictive means of achieving its objectives. Instead, the preamble repeatedly insists that the regulation is constitutionally acceptable because it is content neutral. But the City's "determin[ation]" that section 14-46(b) is content-neutral, Kim Decl., Ex. 3, at 13, does not make it so, and once that fig leaf is removed, the law has no plausible defense.

The City appears to have relied on two interests to support its restriction: (1) promoting tourism and local businesses, and (2) protecting public safety. The first can be dispensed with easily, because promoting tourism and boosting local business are not *compelling* interests. As courts—including the Eleventh Circuit—have recognized, the First Amendment would mean little if the government could evade its protections based on a desire to remove from public space any speech that tourists or customers of local businesses might find unpleasant. *See, e.g.*, *Solantic*, 410 F.3d at 1268 ("general interests in aesthetics" are not "compelling"); *City of Las Vegas*, 466 F.3d at 797 n.14 ("[T]he interests of a private business or organization cannot trump the public's interest in free speech."); *Clear Channel Outdoor v. Town Bd. of Town of Windham*, 352 F. Supp. 2d 297, 304 (N.D.N.Y. 2005) ("[A]ethestics. . . are rarely compelling enough to support a content-based regulation.").

The City's second asserted interest (public safety) also cannot justify the ban. Even assuming that interest is compelling in "the abstract," the City will have to show that section 14-46(b) "will in fact advance those interests." *Turner Broad Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion). There is no evidence or reason to believe that the ordinance does that, because section 14-46(b) was enacted to restrict *peaceful* requests for charitable donations; the law already prohibited (and still prohibits) violent or aggressive solicitation, and HHH does not challenge that provision. *See supra* at 8; *see also City of Boise*, 998 F. Supp. 2d at 917 ("While the aggressive solicitation prohibition is clearly related to public safety, the restrictions on non-aggressive solicitation do not appear to raise the same public safety governmental interest."). And even if section 14-46(b) somehow does further public safety, it clearly is not the least speech-restrictive means for doing so. Indeed, as discussed below, Tampa's ban on peaceful vocal solicitation in such a large area of the City—which is far more restrictive than the laws of many other comparable cities— cannot even satisfy the narrowly tailoring standard applicable to content neutral laws. *Infra* at 17-19.

> 2.   Section 14-46(b) Is Not a Valid Time, Place, or Manner Restriction

Even if the Court were to conclude that the ordinance is content neutral, it still would fail because it is not narrowly tailored to serve an important governmental interest and does not leave speakers with adequate alternatives.

> a.   Section 14-46(b) Is Not Narrowly Tailored to Serve an Important Governmental Interest

As an initial matter, Tampa cannot show that its solicitation ban furthers an important public interest. While public safety is undoubtedly important, a restriction on peaceful solicitation (as opposed to *aggressive* solicitation) does nothing to further it. Likewise, while the City's interest in promoting tourism and local business might

conceivably be important in the abstract, here it is being used to shield individuals on public streets from speech that merely makes them uncomfortable. That is not a legitimate interest. *See McCullen*, 134 S. Ct. at 2529 (recognizing First Amendment "virtue" in the fact that individuals on public streets may be confronted with "uncomfortable message[s]"); *City of Boise*, 998 F. Supp. 2d at 917 ("Business owners and residents simply not liking panhandlers in acknowledged public areas does not rise to a significant governmental interest."). The ordinance's preamble touts the fact that Ybor City is a "national historic landmark district," Kim Decl., Ex. 3, at 12 (capitalization omitted), but neither it nor Tampa's downtown is a museum. The main attraction in Ybor City is a several block stretch along Seventh Avenue comprising bars, clubs, restaurants, and shops such as cigar stores, tattoo parlors, and an adult novelty store, with loud music and conversation spilling into the streets throughout the night. There is no reason to believe that peaceful vocal solicitation would be disruptive in this boisterous atmosphere, other than the City's belief that people are uncomfortable being asked for donations.

Assuming that Tampa can identify a significant interest that section 14-46(b) actually serves, the law still will fail narrow-tailoring review. To satisfy this standard, the government must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540. So, for example, in *McCullen*, the Supreme Court held that a state law imposing 35-foot buffer zones around abortion clinics was not narrowly tailored, because while the law may have furthered Massachusetts's safety interests, it burdened "substantially more speech than necessary to achieve that interest." 134 S. Ct. at 2537. In support of its judgment, the Court relied on, *inter alia*, (1) the existence of narrower alternatives pursued by other jurisdictions confronting the same

issues, *id.*, (2) the availability of preexisting laws to address those issues, *id.* at 2538, and (3) the law's extension to numerous places where the evidence suggested government concerns were not implicated, *id.* at 2540.

Applying *McCullen* here, there is no basis to uphold a law that limits speech in an entire downtown and historic district. *Cf. Smith*, 177 F.3d at 956-57 (law restricting solicitation along a stretch of the beach and accompanying sidewalks was narrowly tailored because its effect was "materially mitigated by the allowance of begging in the streets, on sidewalks, and in many other public fora throughout the City"). *First*, Tampa's legislation is unusually and unnecessarily sweeping. Tampa is not the only city with areas it considers historically significant or that wants to promote downtown economic development. Yet cities like Atlanta, Boston, Chicago, Philadelphia, San Francisco, and Washington, D.C. only prohibit "aggressive solicitation" and solicitation near a limited number of particularly sensitive areas, such as ATMs.[4] Here, the City has provided no reason to believe that a more targeted approach to limiting solicitation would be ineffective in Tampa's historic district or downtown.

*Second*, Tampa already has laws on its books that could accomplish section 14-46(b)'s purported goals. Section 14-46(a), the pre-existing (and unchallenged) prohibition on violent or aggressive solicitation, effectively addresses any concerns about public safety from soliciting, as well as any concerns the City might have that harassing behavior by solicitors could negatively affect tourism and businesses. The City also has other legal

---

[4] ATLANTA, GA., CODE §106-85; BOSTON, MASS., CODE § 16-41; CHICAGO, ILL., CODE § 8-4-025; PHILADELPHIA, PA. CODE § 10-611; SAN FRANCISCO, CAL., CODE § 124.2; WASHINGTON, D.C., CODE §23-2302. There are many other cities that follow the same approach. *See, e.g.,* BERKELEY, CAL., CODE § 13.36.010; DENVER, COLO., CODE § 54-548; FORT LAUDERDALE, FLA., CODE § 16-82; HONOLULU, HAW., CODE § 29-17.2; LAS VEGAS, NEV., CODE § 10.44.030; LONG BEACH, CAL., CODE § 9.35.010; MAUI COUNTY, HAW., CODE § 12.42.030; MILWAUKEE, WIS., CODE § 106-1.1; NASHVILLE, TENN., CODE § 11.12.090 (2008); TULSA, OKLA., CODE § 37.11.1105; SEATTLE, WASH., CODE § 12A.12.015; ST. LOUIS, MO., CODE § 15.44.020; TUCSON, ARIZ., CODE § 11-33.1.

tools to address threatening, abusive, obstructive, or otherwise dangerous behavior by solicitors (or anyone else).[5]  The existence of these alternatives further underscores that section 14-46(b) is not narrowly tailored.  *See McCullen*, 134 S. Ct. at 2538 (Massachusetts could have addressed issues of obstruction by enforcing existing laws); *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949-50 (similar); *Clatterbuck*, 2015 WL 727944, at *11 (similar).

*Third*, section 14-46(b)'s scope does match up with the interests the City has identified.  Even if the City could lawfully designate limited parts of Tampa as solicitation free zones (which HHH disputes), the law here is vastly overinclusive.  In downtown Tampa, the law encompasses streets around not only potential attractions like the Convention Center and the Riverwalk, but also the Tampa Police Department headquarters, the Hillsborough County Courthouse, the office of the Mayor, and City Hall.  And in Ybor City, the ban extends far beyond the main Seventh Avenue cluster of restaurants and bars to streets filled with auto-body shops, warehouses, and apartment complexes.  Compl. ¶ 58.

### b.    Section 14-46(b) Does Not Leave Open Ample Alternative Channels for Communication

Finally, even if the Ordinance is narrowly tailored, it still violates the First Amendment because it fails to provide HHH (and other speakers) with "adequate substitutes . . . for the important medium of speech that . . . has [been] closed off."  *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994).  By preventing HHH from using the sidewalks and streets to engage in solicitation throughout all of downtown Tampa and Ybor City, section 14-46(b) forces HHH to take its speech to less busy and populous parts of Tampa,

---

[5] *See, e.g.*, FLA. STAT. §§ 784.011 (prohibiting assault), 823.01 (prohibiting public nuisances), 810.08 (prohibiting trespass); TAMPA, FLA., CODE § 14-41 (prohibiting people from gathering in groups that obstruct streets or sidewalks); TAMPA, FLA., CODE § 22-8 (prohibiting people from placing anything on public property that obstructs pathways).

which are significantly less effective locations for soliciting charitable donations. Particularly when combined with the roadside solicitation ordinance, *infra* at 23-24, the City's laws do not provide organizations like HHH a realistic way to use Tampa's traditional public forums to solicit charitable donations.

The fact that section 14-46(b) includes a limited exception for solicitation in these areas "that *only* involves holding a sign," (emphasis added), does not save it. The opportunity for HHH volunteers to distribute literature and engage with the public while soliciting is central to the organization's objectives. Compl. ¶ 45. Vocal communication lets HHH spread its message, promote its mission, and build relationships with the public. *Id.*; *see also Williams-Yulee*, 135 S. Ct. at 1665 ("[N]oncommercial solicitation is characteristically intertwined with informative and perhaps persuasive speech."). "[W]hile the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—*such as normal conversation* and leafleting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others." *McCullen*, 134 S. Ct. at 2536 (emphasis added). Therefore, "[w]hen the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.*

In *McCullen*, the Supreme Court held that the First Amendment does not allow the government to tell speakers to give up one-on-one conversations with women they were trying to persuade and instead "display[] signs" from several feet away. *Id.* Here, the First Amendment does not permit the City to tell speakers to avoid ordinary human interaction when soliciting for charity by standing mute with a sign. *See City of Boise*, 998 F. Supp. 2d at 917 ("While the ordinance does leave open the ability to sit or stand passively in a

very limited public area with a sign requesting money or property, this is not an ample alternative channel for communication of the information.").

### C. HHH is Likely to Demonstrate that Section 25-173 Is Unconstitutional Both on Its Face and As Applied to HHH

#### 1. Section 25-173 Is an Invalid Content-Based Regulation

Like section 14-46(b), section 25-173, which broadly restricts roadside solicitation throughout Tampa, is content based because it targets solicitation while allowing other speech in the same time and place. *See supra* at 12-15. If there were any doubt, the fact that the City granted an exemption from its ban for one set of speakers (newspaper vendors) while proscribing the speech of another group (solicitors, including charitable groups) should remove it. *See Carey v. Brown*, 447 U.S. 455, 460-62 (1980) (law that bans most picketing in residential areas but allows labor picketing is content based); *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998) ("[W]hen exceptions to the restriction on noncommercial speech are based on content, the restriction itself is based on content." (internal quotation marks omitted)).

Section 25-173's content-based restriction of roadside solicitation cannot survive strict scrutiny. Even assuming that traffic safety is a compelling government interest (rather than merely an important one), *but see Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993) ("The deleterious effect of graphic communication upon . . . traffic safety . . . is not a compelling state interest"), the City cannot show that its broad proscription on solicitation serves that interest in the least restrictive way possible. Indeed, the exemption for newspapers establishes conclusively that it does not. *First*, the law's "[u]nderinclusiveness . . . reveal[s] that [it] does not actually advance a compelling interest." *Williams-Yulee*, 135 S. Ct. at 1668. If the City really believed that preventing pedestrians from interacting with vehicle occupants was an interest of the "highest order,"

it would not condition the legality of those interactions on whether a newspaper changes hands along with money. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (internal quotation marks omitted). *Second*, the carve-out for newspaper vendors who follow certain safety rules demonstrates that the City had a less restrictive alternative: provide charities like HHH with the same exception if they follow the same rules. The City's failure to do so dooms section 25-173. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2782 (2014) (government's regulation failed the least-restrictive means test by refusing to extend an accommodation offered to one group to another similarly situated group).

2. The Roadside Solicitation Ban Is Not a Valid Time, Place, or Manner Restriction

a. The Ban Is Not Narrowly Tailored.

Section 25-173 also cannot survive under the test applicable to content-neutral laws. The law's underinclusiveness in light of the newspaper carve-out causes it to fail intermediate as well as strict scrutiny. *See, e.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 (1993) (where "[t]he city has asserted an interest in esthetics, but respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on [the city's] sidewalks," the ordinance was unconstitutional); *News & Sun-Sentinel Co. v. Cox*, 702 F. Supp. 891, 902 (S.D. Fla. 1988) (statute was unconstitutional where it only prohibited "commercial" activity on roads, so that newspaper sales were barred but free distribution of newspapers was not).

Section 25-173 is also overinclusive in at least two important respects. *First*, the City has offered no reason why less-restrictive laws would not fulfill its public safety interest—why making the measures applicable to newspaper vendors (wearing safety apparel and following other rules set forth in TAMPA, FLA., CODE § 25-173(c)) would not

work for all solicitors or at least those representing registered charities like HHH. Moreover, Tampa could have followed the lead of numerous other cities that have adopted more targeted restrictions on roadside solicitation. For example, many cities exempt traffic medians from laws regulating roadside speech[6]—in some cases specifically directing solicitors to use medians as a "place of safety"[7]—or exempt solicitation from sidewalks.[8]

*Second*, the law imposes a city-wide ban on solicitation along every road in Tampa (Sundays excepted) "regardless of location or traffic volume." *Reynolds*, 779 F.3d at 231. The limited Sunday exception demonstrates that the City can specify with particularity the handful of intersections where solicitation might be too dangerous to allow. *See* 25-173(f)(10). But the City made no similar effort to identify dangerous locations for roadside solicitation the rest of the week. Its adoption of a city-wide restriction without evidence that it faced a city-wide safety problem is not narrowly tailored. *See Reynolds*, 779 F.3d at 231; *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949.

        b.        <u>Section 25-173 Does Not Provide Adequate Alternatives</u>

Section 25-173 also is invalid because it does not leave HHH with adequate alternative opportunities for solicitation. Particularly when the impacts of section 14-46(b) and section 27-173 are combined, the City's laws pose a tremendous barrier to organizations like HHH engaging effectively in solicitation anywhere in Tampa where they might find an audience. But even on its own, section 25-173 would fail this part of the

---

[6] *See, e.g.*, *ACORN v. St. Louis Cnty.*, 930 F. 2d 591, 594 (8th Cir. 1991); *Sun-Sentinel Co. v. City of Hollywood*, 274 F. Supp. 2d 1323, 1332 (S.D. Fla. 2003).

[7] *See, e.g.*, LOUISVILLE-JEFFERSON CNTY., KAN., METRO GOV'T CODE tit. xi, § 117.11(o) (solicitors must withdraw "to a place of safety on a median or on the side of a highway" when traffic lights turn green); ORLAND PARK, ILL., CODE § 7-5-10-5 (2014) (prohibiting solicitation at intersections "without sidewalks or a median strip to provide a safe area for solicitors").

[8] *See, e.g.*, *Reynolds*, 779 F.3d at 225 (highway defined to exclude sidewalk); *Cutting v. City of Portland*, No. 13-cv-359, 2014 WL 580155, at *3 (D. Me. Feb. 12, 2014) (ban applicable only to medians).

time, place, and manner test because a law does not provide adequate alternatives if it prevents a speaker from reaching one audience even if she may still reach other groups. *See Gilleo*, 512 U.S. at 57 (overturning an ordinance restricting residents' ability to post signs on their property in part because "a person who puts up a sign at her residence often intends to reach *neighbors*, an audience that could not be reached nearly as well by other means" (emphasis in original)). Here, HHH's "target audience" when soliciting from the medians "[was] *drivers*," *Reynolds*, 779 F.3d at 232 n.5 (emphasis in original), and section 25-173 has blocked the organization from reaching that audience.

## II.     HHH Has Established the Remaining Factors for a Preliminary Injunction

### A.     Homeless Helping Homeless Is Suffering Continuous Irreparable Injury in the Loss of Its First Amendment Freedoms

"[I]t is well settled that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor*, 458 F.3d at 1271-72 (alteration in original) (quoting *Elrod*, 427 U.S. at 373); *see also Scott*, 612 F.3d at 1295 (same); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (same). The penalization of HHH's First Amendment rights cannot be "cured by the award of monetary damages" if HHH prevails in this litigation. *KH Outdoor*, 458 F.3d at 1272.

### B.     The Balance of Harms and Public Interest Weigh In Favor of Granting a Preliminary Injunction

The third and fourth preliminary injunction factors are also satisfied. With respect to the balance of harms, "even a temporary infringement of First Amendment rights constitutes a *serious and substantial injury*." *Scott*, 612 F.3d at 1297 (emphasis added) (quoting *KH Outdoor*, 458 F.3d at 1272). And while that interest alone is sufficient, the challenged ordinances' ongoing and overwhelmingly negative effect on HHH's fundraising capacity and corresponding ability to provide vital services for Tampa's homeless further supports injunctive relief. *See* Compl. ¶ 50. On the other side of the ledger, "the public,

when the state is a party asserting harm, has *no interest* in enforcing an unconstitutional law." *Id.* (emphasis added). Finally, because the public has no interest in enforcing an unconstitutional speech restriction, an injunction against enforcement cannot "disserve" it. *See id.* at 1290, 1297.

## CONCLUSION

For the foregoing reasons, HHH respectfully requests that the Court immediately enjoin the City of Tampa, Florida, its officers, agents, employees, attorneys, and all persons who are in active concert with them from enforcing TAMPA, FLA., CODE ch. 14 art. II, div. 2, § 14-46(b), and from enforcing TAMPA, FLA., CODE ch. 25, art. I, div. 3, § 25-173, insofar as the latter prohibits individuals from being upon or going upon any road, or being within four feet of the edge of the road, for the purpose of distributing materials or goods or soliciting charitable contributions of any kind of from the occupant of any motorized vehicle local on public roads under circumstances where newspaper sales conducted in the same time, place, and manner would be permitted. *See* TAMPA, FLA., CODE ch. 6, art. III, div. 12, § 6-265.

Dated: May 20, 2015                    Respectfully submitted,

  /s/ David M. Snyder       
Kevin M. Martin (pro hac vice pending)
Joseph P. Rockers (pro hac vice pending)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Phone: (617) 570-1000
Fax: (617) 523-1231

Frederick C. Schafrick (pro hac vice pending)
Brian T. Burgess (pro hac vice pending)
Andrew Kim (pro hac vice pending)
GOODWIN PROCTER LLP
901 New York Avenue
Washington, D.C. 20001
Phone: (202) 346-4000
Fax: (202) 346-4444

David M. Snyder
Florida Bar No. 366528
DAVID M. SNYDER, P.A.
4230 S. MacDill Ave.
Suite 229
Tampa, FL 33611
Phone: (813) 258-4501
dmsnyder@dms-law.com

*Counsel for*
*Homeless Helping Homeless, Inc.*

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that the foregoing document and the accompanying Declaration of Andrew Kim, together with the exhibits thereto, were served with the Summons and Verified Complaint in this cause to the following:

City Attorney
City of Tampa
Old City Hall, 5th Floor
315 E. Kennedy Blvd.
Tampa, FL 33602

              /s/ David M. Snyder
              David M. Snyder, Esq.

Florida Bar No. 366528
Attorney for Plaintiffs
DAVID M. SNYDER
Professional Association
4230 S. MacDill Ave. Ste 229
Tampa FL 33611
Telephone: 813-258-4501
**Email: dmsnyder@dms-law.com**