UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HOMELESS HELPING HOMELESS, INC.,

Plaintiff,

v.

CITY OF TAMPA, FLORIDA

Defendant.

Civil Action No. 8:15-cv-01219-
SDM-EAJ

## **VERIFIED AMENDED COMPLAINT**

Plaintiff Homeless Helping Homeless, Inc. ("Plaintiff" or "HHH"), by and through its

attorneys, hereby alleges as follows:

## **INTRODUCTION**

1.     Plaintiff HHH is a registered non-profit charity with a compelling mission:

organizing dozens of homeless persons in Tampa to help each other in a cooperative and caring

fashion, through the provision of shared housing, distribution of food, and the provision of

facilities for washing clothes, taking showers, and storing belongings.  In doing so, HHH

encourages personal responsibility even as it tends to basic human needs.  Its founder,

Adolphus Parker, was honored this April as a finalist for a "HEART" award for his work with

HHH by the Housing & Education Alliance of Tampa Bay.  Although HHH utilizes the

volunteer labor of its homeless clients in providing many of its services, HHH still has bills to

pay and that requires money.  For years, uniformed members of HHH spread word of its

mission and sought charitable support from strangers in the locations in Tampa where people

are most accessible: in pedestrian-friendly areas such as downtown Tampa and Ybor City, and at traffic lights where cars are stopped. HHH managed to collect tens of thousands of dollars a year in such a fashion, money desperately needed to support HHH's charitable mission. Without this major source of funding, HHH faces a significant and growing risk that it will no longer be able to fund its operations and provide needed shelter and services to Tampa's many homeless persons.

2.  HHH is filing this lawsuit because Defendant the City of Tampa (the "City") has—in a discriminatory, content-based manner—progressively eliminated HHH's ability to interact with Tampa residents and visitors to solicit charitable donations. First, the City barred HHH volunteers and other charitable solicitors from asking vehicle occupants for donations at stop lights—even as the City continued to allow commercial newspaper vendors to sell newspapers at such locations. TAMPA, FLA., CODE ch. 25, art. I, div. 3, § 25-173 ("section 25-173"). In response to the filing of this lawsuit the City repealed that section 25-173.

3.  Second, the City outlawed speaking with passersby in an expansively designated section of the city—all of downtown and Ybor City—in order to ask for charitable donations. TAMPA, FLA., CODE ch. 14 art. II, div. 2, § 14-46(b) ("section 14-46(b)" or the "challenged ordinance"). Under the challenged ordinance, HHH volunteers only can stand mutely holding a sign even while—in areas such as the stretch of Seventh Avenue in Ybor City crowded with bars, cigar shops, tattoo parlors, and a sex shop—raucous conversation goes on all around them. The City has thus uniquely barred solicitors from engaging in the "close conversation" that the Supreme Court recently confirmed enjoys particular protection under the First Amendment. *McCullen v. Coakley*, 134 S. Ct. 2518, 2536 (2014).

4.     Section 14-46(b) is a content-based speech restriction, because it targets one form of speech—certain solicitations—while allowing others to speak a different message (including different solicitations) at the same time and in the same place.  It cannot survive the strict scrutiny required of content-based regulations.  By the City's own admission in its Answer to HHH's original complaint, Section 14-46(b) does not further a compelling interest; even putting aside that admission, the promotion of tourism is insufficient justification for abridging the fundamental right of charitable solicitation in a huge swath of the city, especially in a content-based manner.

5.     Even assuming that section 14-46 is content neutral, it still is unconstitutional. It is not narrowly tailored to accomplish the City's interests.  Section 14-46(b) also leaves inadequate alternative channels for charitable solicitation.

6.     Because Section 14-46(b) is an unconstitutional restriction on speech, HHH seeks a judgment under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and FLA. STAT. § 86.021, that sections 14-46(b) of the Tampa Code of Ordinances violates HHH's right of freedom of speech under the First and Fourteenth Amendments to the United States Constitution and article one, section four of the Florida Constitution.  Plaintiff also seeks preliminary and permanent injunctive relief in the form of an order enjoining the City from applying or enforcing the challenged ordinance.

## THE PARTIES

7.     Plaintiff HHH is a nonprofit corporation founded in 2009.  It is registered as a charitable organization under section 501(c)(3) of the Internal Revenue Code and section 496.405(1) of the Florida Statutes and renews its registration on an annual basis in compliance

with State law.  Its chief mission is to aid homeless individuals by providing emergency shelter and to assist homeless men and women in bettering their lives.  HHH is based in Tampa, Florida.

8.      Defendant City of Tampa is a municipal corporation organized under the laws of the State of Florida.  The City is the legal and political governmental entity responsible for the actions of the City of Tampa Police Department and its officials, agents, and employees.

## JURISDICTION AND VENUE

9.      This case arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1988.  The Court also has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.  The Court has jurisdiction over the state law claim presented pursuant to 28 U.S.C. § 1367.

11.     Venue in this district is proper under 28 U.S.C. § 1391(b) because the City is located in this district, and a substantial part of the events or omissions giving rise to the claims occurred within this district.  This case is properly filed in the Tampa Division pursuant to Local Rule 1.02.

## FACTS

12.     Tampa has seen record levels of homelessness in recent years.  As is true in other parts of the country, Tampa's homeless ask for charity on the City's public streets and sidewalks.  So, too, do charitable organizations including HHH.

13.     During this time, the City has enacted a series of increasingly restrictive laws designed to curb charitable solicitation and, ultimately, diminish the visible presence of the homeless in Tampa.

## I.     HOMELESS HELPING HOMELESS

14.     HHH is a Tampa-based organization devoted to providing emergency shelter for individuals in a distressed situation.  Its mission is to break societal stereotypes by giving homeless men and women the opportunity to better their own lives through service.

15.     HHH was founded in 2009 with just a handful of volunteers.  It is now a multi-site operation, providing 89 beds across six different facilities to vulnerable groups of underprivileged Tampa citizens.  Homeless clients serve in key organizational staff positions.

16.     HHH typically houses more than 70 individuals per night, provides free meals to approximately 3,000 individuals per month, distributes hygiene kits, and assists individuals in obtaining social services, educational assistance, and permanent employment.

17.     HHH has no major financial corporate donors or government grants and largely relies on private donations to carry out its operations and fulfill its mission.  To facilitate collection of these private donations, HHH's staff, residents, and volunteers frequently solicit on the organization's behalf from both pedestrians and motorists in Tampa. HHH historically enjoyed significant success raising money in this manner, and its volunteers encountered very few problems.

## II.  THE CHALLENGED ORDINANCE

18.     The City has not always limited solicitors in the downtown and Ybor City areas to standing mutely with a sign.

19.     In 2013, after the City previously had enacted its now-repealed ban on roadside solicitation, Tampa Mayor Bob Buckhorn called for further action to clamp down on solicitation by the homeless.  In response, the City Council took up the issue of solicitation once more, starting with a hearing on May 2, 2013.  The purpose of the hearing was for the Tampa Police Department to give a staff report "regarding the multiple populations of homeless and vagrancy."

20.     During the meeting, Assistant Chief John Bennett of the Tampa Police Department commented on the "disproportionate challenges in the Ybor and downtown area" caused by homelessness.  After the Assistant Chief's report, the Council began consideration of a solicitation ban for those areas.

21.     Responding to the suggestion of a geographic ban, Councilwoman Mulhern noted that Downtown Tampa and Ybor City are the most pedestrian-friendly communities in Tampa.  She also opined that the designated zones were "a large area to cover."

22.     Other members of the Council expressed support for a solicitation ban and made it obvious that they intended to target the homeless.  One council member, for instance, cited the "newer incarnation of difficulty" that the homeless specifically posed to commercial development and tourism.

23.     One council member asked the City Attorney's office for two draft ordinances. He first requested a prohibition on solicitation "in front of banks, ATM machines, . . . sidewalk

cafes, [and] other specific areas in which people are somehow confined." The same council member also asked for provisions restricting solicitation in "downtown and Ybor City . . . the two places where [Tampa has] large numbers of pedestrians on foot and a lot of public activity."

24. Once the proposed ordinances were drafted and presented to the public, they drew heavy criticism. The geographic scope of the proposed downtown/Ybor City ban proved particularly controversial.

25. When asked to defend the geographic scope of the solicitation ban, Rebecca Kert, an assistant city attorney, explained that Downtown Tampa and Ybor City were selected for the draft solicitation ordinance because "there was a recognition that these two areas, maybe not more important than the rest of the city, [] are unique within the city and that they are major tourist venues." Both areas were "connected by the trolley and . . . very pedestrian oriented," increasing the likelihood of face-to-face encounters.

26. Pressed further by Councilwoman Mulhern, Ms. Kert explained that there was no "satisfactory answer" to the question of how the geographic boundaries were drawn. Ms. Kert stated: "[T]here isn't a magic number out there that five square miles is enough. And two square miles is enough." She went on to say the boundaries were not based on "one single factor," or that "there are businesses downtown."

27. City council members defended the proposed ordinances by citing an interest in "protecting . . . commercial and tourist zones." A few members of the business community, such as the Ybor City Development Corporation, also voiced their support for the ordinances, citing business interests. Both proposed ordinances passed with one dissenting vote and went

into effect in late July 2013.

28.     Ordinance No. 2013-95, codified at TAMPA, FLA., CODE § 14-46(b), makes it "unlawful in the City . . . for any person to solicit donations or payment when either the solicitor or the person being solicited is located in, on, or at any of the following locations or premises thereof:  (1) Downtown/Ybor Area Prohibited Zone; (2) Bus, trolley stop, or transit stop; (3) Sidewalk café; or (4) Area within fifteen (15) feet (in any direction) of an automatic teller machine or entrance to a financial institution."

29.     Section 14-46 permits "solicitation that only involves holding a sign."  It also allows commercial activities of entities that operate under, *inter alia*, "franchise, concessions, or temporary license agreements or concessions for special events."

30.     "Solicit" is defined as "attempts in person to obtain charitable contributions, or attempts to sell any good or service, for the benefit of the solicitor or on behalf of an individual or organization."

31.     The "Downtown/Ybor Area Prohibited Zone" ("Prohibited Zone") covers "the land area bounded on the north by West Palm Avenue (to the northern edge of pavement), bounded on the west by North Boulevard (to the western edge of pavement) until North Boulevard crosses the Hillsborough River, then by the Hillsborough River (to the water's edge), bounded on the south by Garrison Channel (to the water's edge), and bounded by the east by Ybor Channel (to the water's edge) as far north as E. Harbor Street (the northern edge of pavement) then west until the eastern edge of pavement of N. 14th Street, then north until the southern edge of pavement of Adamo Dr., then east until the eastern edge of pavement of 26th Street bounded on the east by 26th Street (to the eastern edge of pavement)."



32.     Section 14-46(b) targeted conduct in which HHH had been engaging for years. After the City implemented its now-repealed section 25-173 in 2011, which precluded HHH volunteers from soliciting from drivers, HHH shifted its in-person collection efforts to Downtown Tampa and Ybor City. HHH volunteers chose areas where there was ample foot-traffic and they could reach a broad audience, but where there was wide sidewalk space to solicit safely and without causing disruptions.  In 2013, HHH collected over $26,000 in charitable contributions from pedestrians in these areas.

33.     HHH volunteers soliciting downtown and in Ybor City wore identification with their organizational affiliation:



In the course of soliciting, representatives distributed written materials regarding HHH, discussed the organization's mission of providing homeless individuals with emergency and shelter services while directly involving the homeless in HHH's operation, and invited passersby to place donations into a sealed container.



34.     As far as HHH is aware, Tampa Police have never received any serious complaints about the conduct of HHH's volunteers, and its volunteers were not cited by the police for any inappropriate behavior while soliciting.

35.     With the implementation of section 14-46(b), HHH now has been shut out from soliciting in the City's major pedestrian areas.   Because of its inability to solicit in the Prohibited Zone, HHH has lost tens of thousands of dollars since the ordinance went into effect.

36.     The loss in donations received by street solicitors has hampered HHH's ability to provide essential services to the Tampa homeless population.   HHH has been forced to abandon plans to provide additional services to Tampa's many homeless individuals and to cut back on some existing services.

37.     HHH would like its members, staff, and residents to solicit on its behalf in the Prohibited Zone, but has been warned by police that doing so will result in criminal sanctions.

As a practical matter, HHH knows that it is impossible for its volunteers to effectively solicit charitable contributions while standing mutely with a sign, nor is it human nature for people to avoid talking with would-be or actual donors. As a result, HHH has stopped soliciting in downtown Tampa and Ybor City. But for the ordinance, HHH volunteers would continue to solicit in these locations.

38.     HHH has worked hard to find alternative sources of funding to the money it raised while soliciting for contributions, but it has faced repeated obstacles and it has not been able to replace the consistent source of revenue it raised through soliciting for contributions before the ordinances went into effect. As long as these laws remain in place, HHH faces a serious risk that it will no longer be able to continue its operations and provide shelter and services to homeless persons in Tampa.

## III.     SECTION 14-46(B) IS AN UNCONSTITUTIONAL RESTRICTION ON SPEECH

39.     "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). Government restrictions on speech therefore fall into one of two categories. They are content based if they "impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (internal quotation marks omitted)). "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."

*Id.* at 2230. On the other hand, if a regulation "places no restrictions" on "any subject matter that may be discussed," but neutrally regulates the time, place, or manner of speech, the regulation is content neutral. *Hill v. Colorado*, 530 U.S. 703, 723 (2000).

40. Section 14-46(b) is content based on its face and cannot survive the First Amendment scrutiny applied to content-based laws. Indeed, even if found to be content-neutral, Section 14-46(b) still fails constitutional scrutiny.

41. Section 14-46(b) prohibits "charitable contributions, or attempts to sell any good or service, for the benefit of the solicitor or on behalf of an individual or organization" in the downtown and Ybor City districts. But it allows many other forms of speech uttered in the same time, place, and manner, such as licensed commercial vending and political speech. Because Tampa's law enforcement officials must "examine the content of the message that is conveyed" to discern whether the speaker has violated the ban, it is content based. *See McCullen*, 134 S. Ct. at 2531. And because it is content-based on its face, it necessarily is subject to strict scrutiny. *Reed*, 135 S.Ct. at 2228.

42. The City had no compelling interest in implementing section 14-46(b). The City already conceded as much, in its Answer to Plaintiff's original complaint. City Ans. to Compl. ¶ 55, ECF No. 25 ("[t]he City had no compelling interest in implementing section 14-46(b).") In its Opposition to Plaintiff's original motion for a preliminary injunction, the City never argued that section 14-46(b) could survive strict scrutiny; it only argued that strict scrutiny does not apply. Under *Reed*, that argument is meritless.

43. Even putting aside the City's concession, section 14-46(b) does not advance a compelling government interest. The City Council asserted that the ban would help promote

tourism and commercial interests in the downtown and Ybor City districts. But the promotion of local commerce and tourism are not sufficiently compelling so as to survive strict-scrutiny review. *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1268 (11th Cir. 2005) (tourism); *ACLU v. City of Las Vegas*, 466 F.3d 784, 797 n.4 (9th Cir. 2006) (commercial interests). Section 14-46(b) also does not further a compelling interest in safety because it bans peaceful solicitation. The City already had a ban on "aggressive" solicitation in place.

44. Even if section 14-46(b) were a content-neutral restriction on the time, place, or manner of speech, it still would fail review under the First Amendment because it is not narrowly tailored. Content-neutral regulations of speech in traditional public fora, like the streets of downtown Tampa and Ybor City, must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 134 S. Ct. at 2535 (citation and internal quotation marks omitted).

45. Section 14-46(b) does not satisfy the narrow-tailoring requirement for at least three reasons. *First*, allowing persons on public sidewalks and in other public places who already may be holding signs requesting charitable contributions to also interact vocally with passersby in a polite and respectful fashion does not pose a threat to tourism or business. For example, in areas such as Ybor City, the ban applies to a commercial strip on Seventh Avenue that is crowded with bars, clubs, tattoo parlors, cigar shops, and an adult novelty store, with loud music and conversation spilling into the street throughout the night. The City has no

legitimate interest in requiring solicitors—and only solicitors—to stand mute in such an atmosphere, forbidden from speaking to passersby.

46.     *Second,* the ordinance is over-inclusive as a matter of geography.   The Prohibited Zone contains many pockets of land not frequented by tourists or tied to economic activity, including the Tampa Police Department headquarters, the Hillsborough County Courthouse, and the Office of the Mayor of Tampa.   In Ybor City, the ban extends past the main tourist and commercial attractions into vast areas full of auto body shops, warehouses, and residential apartment complexes.

47.     *Third*, options less restrictive of protected speech, including heightened enforcement of laws against aggressive solicitation, disorderly conduct, and the like, were available to, yet untried by, the City.   Narrow tailoring is not satisfied simply because an approach that burdens a greater amount of speech is easier to implement.  *See McCullen*, 134 S. Ct. at 2540.

48.     Section 14-46(b) also leaves inadequate alternative channels of communication. Charitable solicitors like HHH are left with two options.  They may go to parts of Tampa less frequented by pedestrians and which therefore are less effective for communicating with pedestrians.  Or they may engage in non-vocal communication, which deprives them of an opportunity to develop a rapport with the general public—rapport that is crucial for obtaining donations.  Section 14-46(b) has thus made it far more difficult to solicit contribution while out in Tampa's public spaces.

49.     By either measure of scrutiny—strict or intermediate—section 14-46(b) violates the First Amendment.

## CLAIMS FOR RELIEF

### Count I
### Violation of 42 U.S.C. § 1983

50.     Plaintiff hereby re-alleges Paragraphs 1 through 49 as though fully set forth herein.

51.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

52.     The First Amendment to the United States Constitution, as applicable to the States through the Fourteenth Amendment, prohibits the making of any law that "abridg[es] the freedom of speech."

53.     As described above, section 14-46(b), on its face and as applied to Plaintiff, unconstitutionally infringes or imminently threatens to infringe on Plaintiff's rights under the First and Fourteenth Amendments, including its right to freedom of speech and expression.

54.     HHH's speech has been chilled by the enactment of this ordinance that penalizes its expression. But for the ordinance, HHH, through its representatives, would continue to engage in the solicitation that is now restricted. HHH's loss of its First Amendment rights and the chilling of its expression is an irreparable injury that cannot be cured by the award of money damages if HHH ultimately prevails in this litigation.

55.     Because the City has acted and threatened to act under the color of state law to

deprive Plaintiff of rights guaranteed by the Constitution and laws of the United States, Plaintiff may sue and seek relief pursuant to 42 U.S.C. § 1983.

56.     As a result, Plaintiff is entitled to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

**Count II**
**Declaratory Judgment Under 28 U.S.C. § 2201(a) and Florida Statutes § 86.021**

57.     Plaintiff hereby re-alleges Paragraphs 1 through 56 as though fully set forth herein.

58.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought."

59.     Section 86.021 of the Florida Statutes states "[a]ny person claiming to be interested or who may be in doubt about his or her rights . . . whose rights, status, or other equitable or legal relations are affected by . . . municipal ordinance . . . may have determined any question of construction or validity arising under such . . . municipal ordinance . . . or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder."

60.     Article one, section four of the Florida Constitution states "[n]o law shall be passed to restrain or abridge the liberty of speech or of the press."

61.     As described above, Plaintiff alleges that the challenged ordinances, on its face and as applied to Plaintiff, violates the First and Fourteenth Amendments to the United States Constitution.

62.     The challenged ordinance also abridges the freedom of speech as guaranteed by the Florida Constitution.

63.     Upon information and belief, the City will enforce the challenged ordinance.

64.     There is an actual controversy between the parties as to whether the challenged ordinance is unconstitutional under both the federal and state constitutions.

65.     Plaintiff seek a declaration that the challenged ordinance is unconstitutional and violates Plaintiff's right to freedom of speech as guaranteed by the First and Fourteenth Amendments of the United States Constitution, in addition to article one, section four of the Florida Constitution.

*       *       *

WHEREFORE, Plaintiff respectfully request the following relief:

a)      A preliminary and permanent injunction prohibiting the City from enforcing the challenged ordinance;

b)      A declaratory judgment holding that the challenged ordinance violates the United States Constitution, including the First and Fourteenth Amendments to the Constitution, and the Florida Constitution, including article one, section four;

c)      An award to Plaintiff of costs and attorney's fees; and

d)      Any such other and further relief that this Court deems just and proper.

Dated: August 12, 2015

Respectfully submitted,

HOMELESS HELPING HOMELESS, INC.

By its attorneys,

/s/ David M. Snyder
___

Kevin P. Martin (*pro hac vice pending*)
Joseph P. Rockers (*pro hac vice pending*)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Phone:  (617) 570-1000
Fax:  (617) 523-1231
KMartin@goodwinprocter.com
JRockers@goodwinprocter.com

Frederick C. Schafrick (*pro hac vice pending*)
Brian T. Burgess (*pro hac vice pending*)
Andrew Kim (*pro hac vice pending*)
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, D.C. 20001
Phone:  (202) 346-4000
Fax:  (202) 346-4444
FSchafrick@goodwinprocter.com
BBurgess@goodwinprocter.com
AndrewKim@goodwinprocter.com

David M. Snyder
Florida Bar No. 366528
DAVID M. SNYDER, P.A.
4230 S. MacDill Ave.
Suite 229
Tampa, FL 33611
Phone:  (813) 258-4501
dmsnyder@dms-law.com

*Counsel for Homeless Helping Homeless, Inc.*

## VERIFICATION

I verify under penalty of perjury that the foregoing Verified Complaint, insofar as it relates to Homeless Helping Homeless, Inc., is true and correct to the best of my personal knowledge and a review of available records.

Executed on this <u>12th</u> day of August, 2015.

Adolphus Parker, President
Homeless Helping Homeless, Inc.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 12, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

None

<u>/s/ David M. Snyder</u>
David M. Snyder, Esq.
Florida Bar No. 366528
Attorney for Plaintiffs
DAVID M. SNYDER
Professional Association
4230 S. MacDill Ave. Ste 229
Tampa FL 33611
Telephone: 813-258-4501
Email: dmsnyder@dms-law.com