UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HOMELESS HELPING HOMELESS, INC.,

    Plaintiff,

v.

CITY OF TAMPA, FLORIDA

    Defendant.

Civil Action No. 8:15-cv-01219-SDM-EAJ

## MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65(a) and in compliance with Local Rules 4.06 and 4.05, Homeless Helping Homeless, Inc. ("HHH") moves for an order enjoining the City of Tampa, Florida (the "City"), its officers, agents, employees, attorneys, and all persons who are in active concert with them from enforcing TAMPA, FLA., CODE ch. 14 art. II, div. 2, § 14-46(b). HHH submits this motion simultaneously with its motion for judgment on the pleadings, which seeks permanent injunctive relief. If the Court grants HHH's motion or judgment on the pleadings, then a ruling on this alternative motion would be unnecessary.

**REQUEST FOR ORAL ARGUMENT**

Plaintiff respectfully requests oral argument with regard to this motion and simultaneous motion for judgment on the pleadings and submits that 30 minutes (15 minutes per side) should be sufficient time for argument.

**MEMORANDUM OF LAW**

It is firmly established that the "solicitation of charitable contributions is protected speech" under the First Amendment to the United States Constitution. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 789 (1988). Disregarding that constitutional guarantee, Tampa has regulated solicitation effectively out of existence throughout wide swaths of the City, curtailing an entire category of expression within places—streets, sidewalks, and parks—where the government's ability to restrict speech is "very limited." *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (internal quotation marks omitted).

Tampa's solicitation restrictions have had a dramatic and negative effect on Plaintiff HHH's ability to raise the funds it needs to provide emergency shelter and aid to Tampa's homeless. Prior to 2013, HHH had success raising money from the public by having volunteers solicit contributions from the public throughout the City of Tampa. To maximize its fundraising efforts, HHH focused its solicitation on the areas of Tampa that are most pedestrian-friendly: downtown and the Ybor City district. But the City brought this speech to a halt in 2013, when the City Council banned the solicitation of contributions anywhere in this area. Amending a law that had prohibited only *aggressive* solicitation, the Tampa City Council passed a new provision (section 14-46(b)) prohibiting *all* vocal solicitation for money in downtown Tampa and Ybor City.

HHH is entitled to a preliminary injunction against the enforcement of section 14-46(b) because it satisfies all four factors for preliminary injunctive relief.

*First*, HHH is likely to succeed in its claims that the ordinance violates the First Amendment, both on its face and as applied to HHH. As discussed in greater detail in HHH's motion for judgment on the pleadings, the ordinance is plainly content based under the Supreme Court's recent decision in in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), and the ordinance will not survive strict scrutiny. Section 14-46(b) restricts speech on a single subject—solicitations for money—while leaving other speech and even other forms of solicitation unregulated. An individual in downtown Tampa can ask a pedestrian whether she has accepted Jesus Christ as her savior or invite her to sign a petition to legalize marijuana. But if he asks her to donate to charity, he is a criminal.

Content-based laws are presumptively unconstitutional and the City will not be able to defeat that presumption here; indeed, the City has previously conceded that the law does not further a compelling government interest. *See* City's Ans. to Am. Compl. ¶¶ 4, 42, 43. Even if the Court were to conclude that the ordinance is content neutral, HHH is still likely to prevail because the law is not narrowly tailored. Tampa's asserted interests in this case are hardly unique; all cities seek to protect the safety of their residents and visitors, and many other cities have downtown business districts and historic districts. Yet few cities have sought to advance those interests by shutting off vast geographic areas to effective solicitation. Tampa's sweeping ban on even peaceful speech cannot survive First Amendment scrutiny.

*Second*, Plaintiffs will suffer irreparable harm absent injunctive relief. "'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). *Third*, the balance of harms favors an injunction. Any interest that the City

3

has in enforcing the ordinance is far outweighed by the burden on Plaintiff's First Amendment rights including its loss of opportunities for charitable solicitation. *Fourth*, the public interest calls for an injunction, because the public has no interest in enforcing unconstitutional laws.

## BACKGROUND

The full set of facts relevant to this motion are set forth in greater detail in Plaintiffs' Verified Amended Complaint and the declaration accompanying this motion. The following is a summary of the most relevant facts.

### I. Homeless Helping Homeless

HHH is a 501(c)(3) tax-exempt nonprofit organization that is registered as a charity with the State of Florida and renews its registration on an annual basis in compliance with state law. Am. Compl. ¶ 7. HHH provides emergency shelter and other vital services to Tampa's many homeless and impoverished residents. *Id*. The organization's mission is to provide emergency shelter to anyone in a distressed situation, and its vision is to shatter stereotypes by providing that service through the efforts of homeless men and women themselves. Am. Compl. ¶ 14.

HHH has no major financial corporate donors or government grants. Am. Compl. ¶ 17. As a result, the organization has relied on modest private donations from individuals to carry out its important mission. *Id*. In particular, HHH historically funded many of its activities by soliciting contributions in Tampa. *Id*.

HHH enjoyed significant success raising money in this manner and its volunteers encountered very few problems. Am. Compl. ¶ 17. But HHH's access to these critical sources of revenue and its ability to spread its message have been curtailed by a series of ordinances passed by the Tampa City Council to restrict solicitation. These restrictions

have made it illegal for HHH to engage in constitutionally protected speech throughout large sections of the City—even as other speakers can engage in the same conduct in the same places if they avoid asking for money.

## II. The Challenged Anti-Solicitation Ordinance

### A. HHH's Efforts to Solicit Contributions From Pedestrians in Downtown Tampa and the Ybor City District

Section 14-46(b) targeted conduct in which HHH had been engaging for years. After the City implemented its now repealed roadside-solicitation ban in 2011, which precluded HHH volunteers from soliciting from drivers, the organization shifted its fundraising efforts to soliciting pedestrians in Tampa's downtown and Ybor City districts. Am. Compl. ¶ 32. HHH volunteers chose areas where there was ample foot-traffic to ensure a broad audience, and also where there was wide sidewalk space to solicit safely without causing disruptions. *Id.* HHH volunteers soliciting downtown and in Ybor City wore identification that displayed their affiliation with HHH. Am. Compl. ¶ 33. In the course of soliciting, volunteers distributed written materials regarding HHH, discussed HHH's mission, and invited passersby to place donations into a sealed container. *Id.*

In 2013, HHH collected over $26,000 in donations through in-person solicitations in downtown Tampa and Ybor City. Am. Compl. ¶ 32. These solicitation efforts also provided valuable opportunities for HHH volunteers to spread awareness about HHH and its mission of providing the homeless with both emergency shelter and services and opportunities for service. Am. Compl. ¶ 33. As far as HHH is aware, Tampa Police have never received any serious complaints about the conduct of HHH's volunteers, and its volunteers were not cited by the police for any inappropriate conduct while soliciting. Am. Compl. ¶ 34.

### B. Tampa Restricts Solicitation Downtown and in Ybor City

On July 18, 2013, the City enacted the ordinance that HHH challenges here, section 14-46(b), which prohibits the solicitation of charitable contributions in significant portions of the city, including the entire downtown and Ybor City.

Section 14-46 defines solicitation as any "attempt[] in person to obtain charitable contributions, or attempt[] to sell any good or service, for the benefit of the solicitor or on behalf of an individual or organization." § 14-46(c)(1). The definition extends only to solicitations for money and thus excludes other forms of solicitation, such as asking for signatures on a petition. Section 14-46 contains two distinct bans.

First, subsection 14-46(a) incorporates a pre-existing ban on "aggressive" solicitation that was in place long before the enacted ordinance. That subsection bans soliciting donations or payment by making "an express or implied threat"; by "[e]ndeavoring to maintain contact with a solicited person" and "continuing to verbally demand, ask or beg for, or to solicit donations or payment" after that person declines an initial request; or by attempting "to impede the passage or free movement of [a] solicited person." § 14-46(a). HHH's volunteers have never been found in violation of these prohibitions, and HHH does not challenge the aggressive panhandling ban in this case.

Second, subsection 14-46(b) added a new speech restriction, making it unlawful for "any person to solicit donations or payment when either the solicitor or the person being solicited is located in, on, or at" certain prohibited zones throughout the city. The nonsolicitation zones include the entire downtown area and the Ybor City district, § 14-46(b)(1), along with any "[b]us, trolley stop, or transit stop," "[s]idewalk café," or area within 15 feet of an ATM or "entrance to a financial institution." § 14-46(b)(2)-(4). The law provides for two limited exceptions, exempting "solicitation that *only* involves

holding a sign," § 14-46(b) (emphasis added), as well as the activities of certain commercial entities that, *inter alia*, operate under "franchise, concessions, or temporary license agreements or concessions for special events," § 14-46(d). Violation of the ban is punishable by a fine of up to $500 and/or 60 days in jail. § 14-46(e) (citing TAMPA, FLA., CODE OF ORDINANCES ch. 1, § 1-6).

According to the City, the ordinance was designed to "promote public safety, and protect its citizens and visitors and promote the Ybor City and general downtown area as tourist destinations and economic engines for the City," as well as to "protect its citizens and visitors in areas where they may be or perceive themselves to be vulnerable and/or unable to leave." City Ans. to Am. Compl., exh. D (ECF No. 45-5). The ordinance's preamble did not include any findings that solicitation in the prohibited areas had interfered with these interests, nor did it explain why the preexisting ban on aggressive solicitation was insufficient.

### C. Section 14-46(b)'s Impact on HHH

After Section 14-46(b) went into effect, a member of the City of Tampa Police Department informed HHH that the ordinance prohibited solicitation throughout the downtown area and Ybor district of Tampa and that Tampa police would enforce it by arresting HHH volunteers found soliciting there. *See* Am. Compl. ¶ 37. HHH heeded the officer's warning and its volunteers have not solicited within the prohibited zones since its ordinance went into effect. *Id.* As a result, HHH has lost countless opportunities for its volunteers to advocate for the organization and to seek much-needed donations. *See id.* ¶ 38.

The impact on HHH has been significant. HHH estimates that it has lost tens of thousands of dollars in contributions since the ordinance went to effect. Am. Compl. ¶ 35.

This funding decline forced HHH to abandon plans to provide additional services to Tampa's many homeless individuals and to cut back on some existing services. *Id.* ¶ 36.

## ARGUMENT

HHH is entitled to a preliminary injunction enjoining the enforcement of section 14-46(b). A district court may issue preliminary injunctive relief when the plaintiff demonstrates that: (1) there is "a substantial likelihood that [it] will succeed later on the merits"; (2) it "will suffer an irreparable injury absent preliminary relief"; (3) the plaintiff's injury likely "outweighs any harm that its opponent will suffer as a result of an injunction"; and (4) preliminary relief would not "disserve the public interest." *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). HHH's motion satisfies each factor.

### I. HHH Is Likely to Succeed on the Merits

HHH is likely to succeed in showing that Tampa's anti-solicitation ordinance is an unconstitutional speech restriction, both on its face and as applied to HHH.[1] The ordinance limits speech within public forums on the basis of content, criminalizing requests for charitable contributions while leaving other speech in the same time and place (and conducted in the same manner) unrestricted. Such "content-based regulations are presumptively invalid," *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000) (*quoting R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992)), and Tampa has no reasonable prospect of defeating that presumption here. Even under the test for content-neutral laws, the ordinance would not be likely to survive as a time, place, and manner restriction. The ordinance is wholly disproportionate to the City's asserted interests in

---

[1] The protection afforded to speech under article 1, section 4 of the Florida Constitution "is the same" as the protection provided by the First Amendment *Dep't of Educ. v. Lewis*, 416 So. 2d 455, 461 (Fla. 1982). Accordingly, HHH's First Amendment arguments apply in full to its state-law claims.

8

tourism and public safety and fails to leave HHH (and other similarly situated speakers) with realistically adequate alternatives for expression.

### A. Standard of Review

The speech restricted by sections 14-46(b) occurs within traditional public fora—the City's streets, sidewalks, and parks. Eleventh Circuit precedent "conclusively establishes that . . . sidewalk spaces [are] public forum[s]." *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999). "[P]ublic streets and parks" are quintessential public forums, which, "have been immemorially held in trust for the use of the public" for assembly and expression. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citation omitted)).

The government's ability to restrict speech in a traditional public forum is "very limited." *McCullen*, 134 S. Ct at 2529 (internal quotation marks a omitted). Content-based regulations of speech applicable there are presumptively unconstitutional and subject to strict scrutiny; to survive, the government bears the burden of proving that the law is the "least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005). Even for content-neutral laws, heightened scrutiny applies, and the government bears the burden of proving (1) that the law is "narrowly tailored" to a "significant governmental interest," and (2) "leave[s] open ample alternative channels" for the plaintiff's expression. *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1330 (M.D. Fla. 2011).

### B. HHH Is Likely To Demonstrate That Section 14-46(b) Is Unconstitutional on its Face and As Applied to HHH

#### 1. Section 14-46(b) Is an Invalid Content-Based Speech Restriction

As HHH has explained in its motion for judgment on the pleadings, section 14-46(b) is content based on its face under the Supreme Court's recent decision in *Reed*

because the ordinance, on its face, "singles out specific subject matter for differential treatment." *Reed*, 135 S. Ct. at 2230. The law on its face bans only vocal requests for "donations or payment" throughout broad swaths of Tampa, while leaving other speech unrestricted. Courts that have addressed similar anti-solicitation laws since *Reed* have recognized that they are content based and must survive strict scrutiny. *See Norton v. City of Springfield*, No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015) (finding law similar to section 14-46(b) to be content based); *cf. Browne v. City of Grand Junction, Colo.*, No. 14-cv-809, 2015 WL 3568313, at *3-*6 (D. Colo. Jun. 8, 2015) (holding, even pre-*Reed*, than an anti-panhandling ordinance was content based).

Moreover, the law plainly cannot survive strict scrutiny. To date, the City has not attempted to argue otherwise; indeed, it concedes that the law does not further a compelling government interest—an admission that is fatal under strict scrutiny. *See* Pl.'s Mot. for Judgment on the Pleadings at 9. Even if the City were arguing that the interests behind the law are compelling, section 14-46(b) clearly is not the least speech-restrictive means for furthering these interests. Indeed, as discussed below, Tampa's ban on peaceful vocal solicitation in such a large area of the City—which is far more restrictive than the laws of many other comparable cities—cannot even satisfy the narrowly tailoring standard applicable to content neutral laws. *Infra* at 12-14.

2. Section 14-46(b) Is Not a Valid Time, Place, or Manner Restriction

Even if the Court were to conclude that the ordinance is content neutral, it still would fail because it is not narrowly tailored to serve an important governmental interest and does not leave speakers with adequate alternatives.

### a. Section 14-46(b) Is Not Narrowly Tailored to Serve an Important Governmental Interest

As an initial matter, Tampa cannot show that its solicitation ban furthers an important public interest. While public safety is undoubtedly important, a restriction on peaceful solicitation (as opposed to truly aggressive solicitation) does nothing to further it. Likewise, while the City's interest in promoting tourism and local business might conceivably be important in the abstract, here it is being used to shield individuals on public streets from speech that merely makes them uncomfortable. That is not a legitimate interest. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (recognizing First Amendment "virtue" in the fact that individuals on public streets may be confronted with "uncomfortable message[s]"); *ACLU v. City of Las Vegas*, 466 F.3d 784, 797 n.14 (9th Cir. 2006) ("[T]he interests of a private business or organization cannot trump the public's interest in free speech."); *ACLU v. City of Boise*, 998 F. Supp. 2d 908, 917 (D. Idaho 2014) ("Business owners and residents simply not liking panhandlers in acknowledged public areas does not rise to a significant governmental interest.").

The ordinance's preamble touts the fact that Ybor City is a "national historic landmark district," City Ans. to Am. Compl., exh. D (ECF No. 45-5), but neither it nor Tampa's downtown is a museum. The main attraction in Ybor City is a several block stretch along Seventh Avenue comprising bars, clubs, restaurants, and shops such as cigar stores, tattoo parlors, and an adult novelty store, with loud music and conversation spilling into the streets throughout the night. Am. Compl. ¶ 45. There is no reason to believe that peaceful vocal solicitation would be disruptive in this boisterous atmosphere, other than the City's belief that people are uncomfortable being asked for donations.

Assuming that Tampa can identify an important interest that section 14-46(b) actually serves, the law still will fail narrow-tailoring review. To satisfy this standard, the

11

government must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540. In *McCullen*, for example, the Supreme Court held that a state law imposing 35-foot buffer zones around abortion clinics was not narrowly tailored, because while the law may have furthered Massachusetts's safety interests, it burdened "substantially more speech than necessary to achieve that interest." 134 S. Ct. at 2537. In support of its judgment, the Court relied on, *inter alia*, (1) the existence of narrower alternatives pursued by other jurisdictions confronting the same issues, *id.*, (2) the availability of preexisting laws to address those issues, *id.* at 2538, and (3) the law's extension to numerous places where the evidence suggested government concerns were not implicated, *id.* at 2540.

Applying *McCullen* here, there is no basis to uphold a law that limits peaceful vocal solicitation in an entire downtown and historic district. *Cf. Smith*, 177 F.3d at 956-57 (law restricting solicitation along a stretch of the beach and accompanying sidewalks was narrowly tailored because its effect was "materially mitigated by the allowance of begging in the streets, on sidewalks, and in many other public fora throughout the City"). *First*, Tampa's legislation is unusually and unnecessarily sweeping. Tampa is not the only city with areas it considers historically significant or that wants to promote downtown economic development. Yet cities like Atlanta, Boston, Chicago, Philadelphia, San Francisco, and Washington, D.C. only prohibit "aggressive solicitation" and solicitation near a limited number of particularly sensitive areas, such as ATMs.[2]

---

[2] ATLANTA, GA., CODE §106-85; BOSTON, MASS., CODE § 16-41; CHICAGO, ILL., CODE § 8-4-025; PHILADELPHIA, PA. CODE § 10-611; SAN FRANCISCO, CAL., CODE § 124.2; WASHINGTON, D.C., CODE §23-2302. There are many other cities that follow the same approach. *See, e.g.,* BERKELEY, CAL., CODE § 13.36.010; DENVER, COLO., CODE § 54-

Here, the City has provided no reason to believe that a more targeted approach to limiting solicitation would be ineffective in Tampa's historic district or downtown. Moreover, section 14-46(b) criminalizes vocal solicitation even if the solicitation is welcomed by its intended audience, further demonstrating the law's unconstitutionality. *See Berger v. City of Seattle*, 569 F.3d 1029, 1055 (9th Cir. 2009) (even if the city had an interest in preventing unwelcome speech, the law would still be impermissibly over-inclusive "because it prohibits *all* 'speech activities,' not just those that continue after the recipient of speech has signaled a preference to be left alone").

*Second*, Tampa already has laws on its books that could accomplish section 14-46(b)'s purported goals. Section 14-46(a), the pre-existing (and unchallenged) prohibition on violent or aggressive solicitation, effectively addresses any concerns about public safety from soliciting, as well as any concerns the City might have that harassing behavior by solicitors could negatively affect tourism and businesses. The City also has other legal tools to address threatening, abusive, obstructive, or otherwise dangerous behavior by solicitors (or anyone else).[3] The existence of these alternatives further underscores that section 14-46(b) is not narrowly tailored. *See McCullen*, 134 S. Ct. at 2538 (Massachusetts could have addressed issues of obstruction by enforcing existing laws); *Cutting v. City of Portland*, No. 14-1421, slip op. at 26-27 (1st Cir. Sept. 11, 2015) (similar); *Reynolds v. Middleton*, 779 F.3d 222, 231-32 (4th Cir. 2015) (similar); *Comite*

---

548; FORT LAUDERDALE, FLA., CODE § 16-82; HONOLULU, HAW., CODE § 29-17.2; LAS VEGAS, NEV., CODE § 10.44.030; LONG BEACH, CAL., CODE § 9.35.010; MAUI COUNTY, HAW., CODE § 12.42.030; MILWAUKEE, WIS., CODE § 106-1.1; NASHVILLE, TENN., CODE § 11.12.090 (2008); TULSA, OKLA., CODE § 37.11.1105; SEATTLE, WASH., CODE § 12A.12.015; ST. LOUIS, MO., CODE § 15.44.020; TUCSON, ARIZ., CODE § 11-33.1.

[3] *See, e.g.*, FLA. STAT. §§ 784.011 (prohibiting assault), 823.01 (prohibiting public nuisances), 810.08 (prohibiting trespass); TAMPA, FLA., CODE § 14-41 (prohibiting people from gathering in groups that obstruct streets or sidewalks); TAMPA, FLA., CODE § 22-8 (prohibiting people from placing anything on public property that obstructs pathways).

*de Jornaleros de Redondo Beach*, 657 F.3d at 949-50 (similar); *Clatterbuck v. City of Charlottesville*, No. 11-cv-43, 2015 WL 727944, at *11 (W.D. Va. Feb. 19, 2015) (similar).

*Third*, section 14-46(b)'s scope does match up with the interests the City has identified. Even if the City could lawfully designate limited parts of Tampa as solicitation free zones (which HHH disputes), the law here is vastly overinclusive. In downtown Tampa, the law encompasses streets around not only potential attractions like the Convention Center and the Riverwalk, but also the Tampa Police Department headquarters, the Hillsborough County Courthouse, the office of the Mayor, and City Hall. And in Ybor City, the ban extends far beyond the main Seventh Avenue cluster of restaurants and bars to streets filled with auto-body shops, warehouses, and apartment complexes. Am. Compl. ¶ 46. This sort of "geographic[] over-inclusive[ness]" is incompatible with narrow tailoring. *Cutting*, slip op. at 21-22.

        b.      Section 14-46(b) Does Not Leave Open Ample Alternative Channels for Communication

Finally, even if section 14-46(b) is narrowly tailored, HHH would still be entitled to a preliminary injunction because the City is unlikely to prove that the law provides HHH (and other speakers) with "adequate substitutes . . . for the important medium of speech that . . . has [been] closed off." *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). By preventing HHH from using the sidewalks and streets to engage in solicitation throughout all of downtown Tampa and Ybor City, the ordinance forces HHH to take its speech to less busy and populous parts of Tampa, which are significantly less effective locations for soliciting charitable donations. *See* Am. Compl. ¶ 48. Particularly when combined with remaining restrictions on roadside solicitation that are imposed by

Hillsborough County, *see* Hillsborough County Ordinance § 42-23,[4] the City's laws do not provide organizations like HHH a realistic way to use Tampa's traditional public forums to solicit charitable donations.

The fact that section 14-46(b) includes a limited exception for solicitation in these areas "that *only* involves holding a sign," (emphasis added), does not save it. The opportunity for HHH volunteers to distribute literature and engage with the public while soliciting is central to the organization's objectives. Am. Compl. ¶ 33. Vocal communication lets HHH spread its message, promote its mission, and build relationships with the public. *Id.*; *see also Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665 (2015) ("[N]oncommercial solicitation is characteristically intertwined with informative and perhaps persuasive speech."). "[W]hile the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—*such as normal conversation* and leafleting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others." *McCullen*, 134 S. Ct. at 2536 (emphasis added). Therefore, "[w]hen the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.*

In *McCullen*, the Supreme Court held that the First Amendment does not allow the government to tell speakers to give up one-on-one conversations with women they were

---

[4] Although Tampa has repealed its ordinance restricting roadside solicitation in response to HHH's suit, Hillsborough County imposes its own (even more restrictive) prohibition on solicitation near "all public roads that are open to motor vehicle traffic within the legal boundaries of Hillsborough County," which includes Tampa. Hillsborough County Ordinance § 42-19 *et seq*. Prior to Tampa's repeal of its own ordinance, this County ordinance was displaced by operation of law and did not apply in Tampa. *See* Hillsborough County Charter § 4.09 (providing that where there is a conflict between a county ordinance and a municipal ordinance, "the municipal ordnance shall prevail").

trying to persuade and instead "display[] signs" from several feet away. *Id*. Here, the First Amendment does not permit the City to tell speakers to avoid ordinary human interaction when soliciting for charity by standing mute with a sign. *See City of Boise*, 998 F. Supp. 2d at 917 ("While the ordinance does leave open the ability to sit or stand passively in a very limited public area with a sign requesting money or property, this is not an ample alternative channel for communication of the information.").

II. **HHH Has Established the Remaining Factors for a Preliminary Injunction**

   A. **Homeless Helping Homeless Is Suffering Continuous Irreparable Injury in the Loss of Its First Amendment Freedoms**

"[I]t is well settled that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *KH Outdoor*, 458 F.3d at 1271-72 (alteration in original) (quoting *Elrod*, 427 U.S. at 373); *see also Scott*, 612 F.3d at 1295 (same); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (same). The penalization of HHH's First Amendment rights cannot be "cured by the award of monetary damages" if HHH prevails in this litigation. *KH Outdoor*, 458 F.3d at 1272.

   B. **The Balance of Harms and Public Interest Weigh In Favor of Granting a Preliminary Injunction**

The third and fourth preliminary injunction factors are also satisfied. With respect to the balance of harms, "even a temporary infringement of First Amendment rights constitutes a *serious and substantial injury*." *Scott*, 612 F.3d at 1297 (emphasis added) (quoting *KH Outdoor*, 458 F.3d at 1272). On the other side of the ledger, "the public, when the state is a party asserting harm, has *no interest* in enforcing an unconstitutional law." *Scott*, 612 F.3d at 1297 (emphasis added). Finally, because the public has no interest in enforcing an unconstitutional speech restriction, an injunction against enforcement cannot "disserve" it. *See id.* at 1290, 1297.

## CONCLUSION

For the foregoing reasons, HHH respectfully requests that the Court immediately enjoin the City of Tampa, Florida, its officers, agents, employees, attorneys, and all persons who are in active concert with them from enforcing TAMPA, FLA., CODE ch. 14 art. II, div. 2, § 14-46(b).

Dated: September 11, 2015　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　  /s/ Kevin M. Martin_____
　　　　　　　　　　　　　　　　　　　Kevin M. Martin (pro hac vice)
　　　　　　　　　　　　　　　　　　　Joseph P. Rockers (pro hac vice)
　　　　　　　　　　　　　　　　　　　Kara A. Harrington
　　　　　　　　　　　　　　　　　　　GOODWIN PROCTER LLP
　　　　　　　　　　　　　　　　　　　Exchange Place
　　　　　　　　　　　　　　　　　　　Boston, MA 02109
　　　　　　　　　　　　　　　　　　　Phone: (617) 570-1000
　　　　　　　　　　　　　　　　　　　Fax: (617) 523-1231

　　　　　　　　　　　　　　　　　　　Frederick C. Schafrick (pro hac vice)
　　　　　　　　　　　　　　　　　　　Brian T. Burgess (pro hac vice)
　　　　　　　　　　　　　　　　　　　Andrew Kim (pro hac vice)
　　　　　　　　　　　　　　　　　　　GOODWIN PROCTER LLP
　　　　　　　　　　　　　　　　　　　901 New York Avenue
　　　　　　　　　　　　　　　　　　　Washington, D.C. 20001
　　　　　　　　　　　　　　　　　　　Phone: (202) 346-4000
　　　　　　　　　　　　　　　　　　　Fax: (202) 346-4444

　　　　　　　　　　　　　　　　　　　David M. Snyder
　　　　　　　　　　　　　　　　　　　Florida Bar No. 366528
　　　　　　　　　　　　　　　　　　　DAVID M. SNYDER, P.A.
　　　　　　　　　　　　　　　　　　　4230 S. MacDill Ave.
　　　　　　　　　　　　　　　　　　　Suite 229
　　　　　　　　　　　　　　　　　　　Tampa, FL 33611
　　　　　　　　　　　　　　　　　　　Phone: (813) 258-4501
　　　　　　　　　　　　　　　　　　　dmsnyder@dms-law.com

　　　　　　　　　　　　　　　　　　　*Counsel for*
　　　　　　　　　　　　　　　　　　　*Homeless Helping Homeless, Inc.*

CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on September 11, 2015, I electronically filed the foregoing Motion for Preliminary Injunction and Supporting Memorandum of Law with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

None

       /s/ Kevin P. Martin
Kevin P. Martin
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Phone: (617) 570-1000
Fax: (617) 523-1231
kmartin@goodwinprocter.com